**CREDIT BUREAU REPORTS, INC.**

v.

**RETAIL CREDIT CO. et al.**

**Civ. A. No. 70-H-1157.**

United States District Court,
S. D. Texas,
Houston Division.

Nov. 5, 1971.

John L. Jeffers, Jr., Baker & Botts, Houston, Tex., for plaintiff.

Leroy Jeffers, Harry M. Reasoner, Charles T. Newton, Jr., Vinson, Elkins, Searls, Connally & Smith, Houston, Tex., for defendants.

*Opinion and Order:*

SINGLETON, District Judge.

On the theory that it has been victimized by various violations of federal antitrust statutes, plaintiff, Credit Bureau Reports, Inc., seeks an injunction and a decree of divestiture from Retail Credit Company and its subsidiaries, Retailers Commercial Agency, Credit Bureau, Inc. of Georgia, and Credit Marketing Services, Inc. Specifically, plaintiff contends that defendants are guilty of price-fixing in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)[1], of monopolization and attempted monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2)[2], and have made certain acquisitions since 1966 which may tend to substantially lessen competition as forbidden by Section 7 of the Clayton Act (15 U.S.C. § 18) [3]. The shield raised by the defendants consists of a categorical denial of the charges raised in the complaint in addition to an accusation that plaintiff is itself a monopolist and price-fixer. Defendants also have raised the issue of the proprie-

ty of injunctive relief and, particularly, the question of whether a private antitrust litigant may avail itself of divestiture as a remedy.

## THE PARTIES

Credit Bureau Reports, Inc. (herein CBR), the plaintiff, is a private corporation domiciled in Houston, Texas. The business in which plaintiff is presently engaged is that of nonlocal credit reporting. This service, provided by plaintiff through more than 2,000 local credit bureaus from coast to coast with which plaintiff has contracts, is in response to the needs of large nonlocal credit grantors, such as oil companies, mail-order houses, and bank charge-card systems. By acting as a sales agency, CBR is a vehicle through which local credit bureaus can reach the nonlocal market, while at the same time it meets the demands of the nonlocal credit grantors for standardized forms, uniform billing practices and prices. The mechanics by which a nonlocal credit grantor obtains a report is to send an order ticket, provided by CBR, directly to the credit bureau which serves the locality in which the individual lives and about whom the credit grantor desires information. This information is supplied on a form also provided by CBR which is forwarded directly to the customer. Periodically, the local bureau bills CBR according to the number of order tickets it has received. CBR remits 85% of the billed amount to the local bureau and in turn invoices the customer for the full amount. Most of

1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ."

3. "No corporation shall acquire, directly or indirectly, the whole or any part of the

stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly."

CBR's stock, except for small amounts owned by its officers, is held by about 706 of the local credit bureaus with which it has contracts. These stockholders select CBR's board of directors.

Retail Credit Company (herein RCC) is a dominant force in the market of insurance credit reporting, i. e., the making and selling of investigative reports to insurance companies used by them to determine the degree of risk with respect to applicants for life insurance, casualty insurance, health insurance and other types of insurance. RCC is headquartered in Atlanta, Georgia, and together with its subsidaries employs approximately 15,000 persons including 7,000 full-time and 4,500 part-time field investigators. Its ownership is spread over 4,200 stockholders. For 1970, RCC had $148,403,000 total revenue, 74% of which was derived from insurance reports and $2,225,067 of which was derived from the sale of investigative credit reports to nonlocal credit grantors. Other direct revenue is attributable to the production and sale of personnel reports, used by employers to assist them in passing upon the qualifications of potential employees, and the production and sale of market research reports for businesses. RCC is a major competitor in the nonlocal credit reporting market.

Retailers Commercial Agency (herein RCA) is a wholly-owned subsidiary of RCC with total 1970 revenues amounting to $3,854,839. Of this sum, $1,636,-307 was attributable to the production and sale of investigative reports [4] to nonlocal credit grantors. A portion of its other revenue is marketing of investigative employment reports. RCA is a New York Corporation primarily engaged in credit reporting and has offices in over 100 metropolitan areas in the United States. The operations of an RCA office are quite similar to those of a credit bureau. RCA competes directly with credit reporting bureaus in both local and nonlocal markets. RCC sells in the nonlocal market for RCA, and the combined facilities of these two companies offer the credit grantor nationwide credit reporting coverage. The RCC-RCA network provides a broad range of credit reporting services which are described and advertised in RCC brochures, and through their coordinated efforts they compete directly with credit bureaus selling through CBR.

Credit Bureau, Inc. of Georgia (herein CBI), another wholly-owned RCC subsidiary, actually owns 120 local credit bureaus together with Credit Bureau, Inc. of Oregon [5] another wholly-owned subsidiary. Eventually, RCC plans to bring all its owned credit bureaus under the management of CBI and is presently engaged in liquidating various other subsidiary corporations owning credit bureaus. Ownership of these bureaus is being transferred to CBI. Many CBI bureaus are also members of CBR. CBI's 1970 revenue was $2,103,692, of which $1,303,047 represented sales through CBR.

Credit Marketing Services, Inc. (herein CMS), is a Georgia corporation organized by its parent corporation, RCC, in September, 1970. At its inception, the function served by CMS was identical to that of CBR. CMS is in direct competition with CBR in the southeastern portion of the United States, but plans are on the drawing board to expand CMS into an organization national in scope. At present, CMS serves only bureaus owned by CBI, but plans eventually to compete for business from non-

---

4. Defendant emphasizes the difference between investigative credit reports and other types of reports. Ordinary credit reports are less expensive than investigative reports because with the former there is a file already in existence which at the most requires only supplementary information to bring it up to date. When, on the other hand, there is no information on an individual available, or when that individual's file contains such a minimal amount of information that would preclude the credit grantor from making an informed decision, a full scale investigation is conducted.

5. Not a defendant herein.

owned bureaus.[6] CMS is currently engaged in marketing efforts on behalf of all bureaus owned by RCC or its affiliates in the United States and on behalf of independent credit bureaus in the southeastern United States.

RCC maintains close control over all its subsidiaries.[7] There is a considerable degree of corporate interconnection among the defendant companies. To illustrate, one individual is president of all the subsidiaries concerned with credit reporting. This same person is a director of RCC and is also a member of a three-man executive committee which carries out the policies of the board of directors and makes the policy decisions for the subsidiaries. The various RCC companies have a centralized cash control system and use the same legal service and corporate printing service.

## CBR'S ALLEGATIONS

CBR is concerned that RCC will use its monopoly power in the insurance reporting industry as a battle axe to drive it out of the credit reporting field, create a RCC dominated monopoly in that business, and effectively thwart CBR's entry into insurance reporting. The particulars in which CBR contends RCC has acted willfully to preserve its insurance monopoly include (a) the acquisition of 100 credit bureaus since 1966, (b) use of monopoly profits to finance these acquisitions, (c) refusal to participate in CBR's insurance survey, (d) the likelihood that CBI-owned bureaus will not be permitted to sell nonlocal insurance reports through CBR, (e) the possibility that RCC-controlled bureaus may be withdrawn from membership in CBR, thereby creating large geographical gaps in its nationwide coverage, (f) RCC's opposition to CBR's corporate reorganization, and (g) the launching of CMS purely for predatory purposes. To remedy these fears, CBR seeks to enjoin defendants from (a) going forward with any sales and service program for independent credit bureaus such as the one now being offered by CMS, (b) acquiring any additional credit bureaus, and (c) terminating the contractual relationships between credit bureaus owned by defendants and CBR. Additionally, CBR requests a decree requiring defendants to divest themselves of all credit bureaus acquired within the last four (4) years.

## CBR'S PRICE–FIXING ALLEGATIONS

The basis of CBR's allegation concerning Section 1 of the Sherman Act is illegal price-fixing. In support of this contention, plaintiff offers the following factual analysis: (1) the integrated, nationwide network of RCC–RCA offices compete directly with local credit bureaus in the sale of credit reports in the nonlocal market; (2) CMS in a factual context was organized to act as a sales agent for local credit bureaus in the sale of credit reports in the nonlocal market; (3) if the original CMS program had gone forward, the defendants would then have determined the prices not only for reports sold by the Retail-Retailers system, but also for reports of local credit bureaus selling in competition with that system in the nonlocal credit reporting market. It is CBR's position that the revision of the CMS program to guarantee prices to be paid local credit bureaus in no way alters the substance of the price-fixing scheme.

There is no need to elaborate upon price-fixing as an anticompetitive evil. Such agreements between horizon-

---

6. CMS is the plaintiff in another suit originally filed in the Northern District of Georgia against CBR in which violations of Section 1 and Section 2 of the Sherman Act (15 U.S.C. §§ 1, 2) are alleged. That action was transferred to this district and consolidated with the case at bar.

7. Other subsidiaries not previously mentioned include Attwell, Vogel and Sterling, Inc., engaged in payroll credit services and engineering and safety investigations for insurance companies and Gay and Taylor, Inc., insurance adjusters. Neither of these companies is a defendant herein.

tal competitors and indirect price-tampering by competitors are not to be tempered with by the rule of reason discussed in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), but instead are considered to be *per se* unreasonable restraints of trade in violation of Section 1. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

■ The fact that RCA and CMS are subsidiaries of RCC does not preclude a finding that a conspiracy exists between two or all of them, for since these defendants "[have] availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities." Perma Life Mufflers v. International Parts, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982, 992 (1968).

■■ However, one of the essential characteristics of any conspiracy to fix prices is the existence of a corrupt agreement to do so, a factor completely lacking in the record. CBR has pointed to no facts showing that Retail-Retailers and CMS actually agreed upon a uniform price structure or even consciously acquiesced in the prices to be charged to local credit bureaus. Maple Flooring Mfg. Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); Cement Mfg. Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925). In the absence of an agreement to fix prices, or an understanding that existing price structures are to remain immobile, CBR's contention must fail for lack of merit.

## THE MARKET AND ITS HISTORY

Since the end of World War II, there has been a revolution in the attitude of the public resulting in an ever-growing increase in the demand for consumer credit and a corresponding willingness on the part of oil companies and credit-card companies to make consumer credit readily available. With the advent of data processing, many companies found it profitable to initiate computerized billing systems. In the credit reporting industry, the computer made it economically feasible to store vast quantities of information at one central location, making information instantly available to those desiring it. The trend towards centralization and concentration in the credit reporting industry has been accelerated by acquisitions of local credit bureaus by other companies. A leader in this acquisition trend has been RCC. At the time of trial, RCC had the largest total credit reporting volume (RCC, RCA and acquired bureaus—local and nonlocal) of any company in the United States and in some areas RCC and its subsidiary corporations are dominant in both local and nonlocal credit reporting. The Frances Smith chain of 43 credit bureaus on the Pacific Coast was acquired by RCC. RCC–RCA became the dominant reporting agency in the northwestern part of the United States. RCC has acquired, either directly or through subsidiaries, over 100 credit bureaus in the United States and the majority of these acquisitions have been acquired since 1966. The major acquisitions of credit bureaus have been financed by RCC and the evidence in this case leads to the inescapable conclusion that the acquisitions of these bureaus by RCC and its subsidiaries have been made with the intent to eliminate competition. An effect of RCC's acquisition is to give RCC the power to control the source of credit information in that area, and in many significant areas, the local credit bureau acquired was a CBR source of obtaining credit reports in the area.

## THE INSURANCE REPORTING INDUSTRY

Generally speaking insurance reporting involves the gathering and sale of

information about people to insurance companies, the most important purpose for insurance reporting being that of guiding the company in making an underwriting decision, i. e., whether or not to issue a policy and, if there is an affirmative decision, what premium to charge. Underwriting reports are commonly divided into two principal markets, namely, life and health insurance reports, and fire and casualty insurance reports. A second way in which insurance companies use reports is to assist them with problems associated with claims on policies in effect.

Life and health underwriting reports are designed to aid the company in evaluating the risk factor of each applicant for a policy. The information in these reports is primarily concerned with verification of the information provided by the individual's application, such as age, employment, duties of employment, health history and participation in aviation activities. These reports may also touch upon the applicant's habits as known to third persons, including general character and reputation.

Fire and casualty insurance reports have the same basic purpose of helping the company to arrive at an underwriting decision. The information in each report depends on the nature of each underwriting decision.

RCC stands alone at the top of the life and health underwriting report market with a volume of about $42,900,000 for 1970, thus, giving it about 80% to 85% of that market. Concentration in life and health reporting is extraordinarily high. RCC is more than eight times the size of its nearest competitor, Hooper-Holmes Bureau, Inc., whose 1970 volume was $5,200,000 or less than ten percent of the market. The one other major competitor, American Service Bureau, had a volume of $4,200,000 or 7.8% of the market. These three companies control over 97% of the life and health market. Prices in the life and health reporting market reflect this concentration in that there appears to be only a

14% to 20% variance among competitors.

Nationwide coverage is a competitive advantage in life and health reporting. Though it might be relatively inexpensive to enter the market locally with the plan of expanding gradually, such would present a substantial handicap when faced with competition. The difficulty in entering the market is witnessed by the fact that there has been no single new entrant in this market for over fifty years.

During 1970, RCC's volume in the fire and casualty underwriting market was about $56,500,000, a predominant share probably between 55% and 65%. Although RCC must bear the strains of more severe competition in fire and casualty reporting, it is highly fragmented.

CBR's first public indication that it was entertaining the idea of going into insurance reporting was announced in an address by CBR's president in 1966. The substance of the address was that CBR planned to make a feasibility study of the selling of credit bureau reports to insurance companies and of the selling of certain other new reports so that no regional or national competitor would be free from competition in the major segment of its portfolio. RCC was cognizant of these plans from the time of this address.

CBR did not further its plans in this field until December 22, 1970, when it was discovered that CBR's officer who had been studying the matter had concluded, since the final enactment of the Fair Credit Reporting Act, that it was now feasible for CBR to enter into the business of selling investigative life insurance reports made by local credit bureaus with their regular personnel by use of the telephone instead of personal interviews by trained investigators as done by RCC. CBR did, in January, 1971, conduct a questionnaire survey of its local credit bureau members as to whether they would be favorably disposed to participating in this new service sold by CBR including specialized re-

ports for insurance companies. Of those consulted, 73.6% of the bureaus indicated an interest in participation.

## THE LAUNCHING OF CMS

CMS was born shortly after the occurrence of two events. This first event was CBR's announcement of its proposal for reorganization. The second was a meeting requested by CBR held in New Orleans in August, 1970, at which CBR's and defendants' top management were present. The tone of the meeting became somewhat hostile when CBR's executive officers interrogated defendants' representative concerning their permitting their bureaus to engage in direct selling, refusing to participate in CBR's insurance survey, voting against CBR's corporate reorganization plan, and their possible intention to withdraw their bureaus from membership in plaintiff.

## THE RELEVANT MARKET

■■ When a business is accused of monopolization in violation of Section 2 of the Sherman Act, it is first necessary to inquire as to the bounds of the market which is said to have been monopolized. Market definition is crucial since "size is of course an earmark of monopoly power." United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). But size in the abstract is meaningless. It must always be related to a market with clearly defined product and geographical boundaries. There can be little doubt in this instance that the relevant geographical market is the entire continental United States.

■ Monopolization is not, however, the only issue in this suit which calls for market definition. The language in Section 2 which declares illegal and monopolization of "any part of the trade or commerce among the several states . . . " has a correlation in the language of Section 7 of the Clayton Act where it is declared that acquisitions are unlawful "where in any line of commerce in any section of the country, the effect of such acquisition of stocks

or assets . . . may be substantially to lessen competition, or tend to create a monopoly." It is settled that the same criteria used in determining relevant market under one provision must be used in determining relevant market under the other. Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449 (9th Cir. 1966). It is less clear, but apparently equally settled that it is necessary to determine the relevant market when a business is charged with attempted monopolization under Section 2 of the Sherman Act. Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

The relevant product market is not quite as easily ascertained. It would be an oversimplification to consider the relevant product market merely in terms of the product sold by the accused monopolist (all credit reporting *and* insurance reports, etc.). United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1955). Application of the reasonable interchangeability test may reduce the relevant product market to a segment or submarket of a larger more readily apparent market. Antitrust Developments, 1955–1968, p. 27. The existence of a submarket "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962).

Further amplification of the concept of the submarket is found in United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). There the court concluded that burglar alarm, fire alarm, and waterflow alarm insurance accredited control station services should be lumped together as a cluster of services, but that other services, e. g., watchman, watchdog services

should be excluded. In each instance, therefore, whether the item of commerce is a product or service, the degree of differentiation is the key as to what the relevant market should include. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

■ Though these general guidelines may serve as a lighthouse to point the direction to the bounds of the relevant market, it "as most concepts in law or economics, cannot be measured by metes and bounds. Nor does the substance of Sherman Act violations typically depend on so flexible a guide." Times-Picayune Publishing Co. v. United States, 345 U. S. 594, 611, 73 S.Ct. 872, 881, 97 L.Ed. 1277, 1291 (1953). A meaningful definition for the relevant market must focus on what the buyers do and not upon what the sellers do, or theoretically can do. United States v. Tidewater Marine Service, Inc., 284 F.Supp. 324, p. 330 (E.D.La.1968). Competition is the key to determining the relevant market. It will include those products or services which may be in competition and will exclude those which do not compete. United States v. Tidewater Marine Services, Inc., *supra*.

Every case must turn upon its own facts, Maple Flooring Mfg. Ass'n v. United States, *supra*, and here the evidence reveals that there is indeed a broad market denominated: the business of gathering information about people. However, in this case when all the facts are boiled together and all the excess water boils away, the conclusion is inescapable that the relevant product market is divided into four submarkets. These submarkets are nonlocal credit reporting, life and health insurance reporting, fire and casualty insurance reporting, and personnel reporting. The "relevant product market" for purposes of this case, in its *Dupont* and *Grinnell* meaning, is the insurance reporting market both life and health, and the fire and casualty submarkets, and the nonlocal credit reporting market.

RCC contends that insurance companies which do their own investigation should be considered part of the relevant product submarkets. But the relevant submarkets must be defined from the buyer's viewpoint. Insurance reports are bought by insurance companies who cannot, or will not, depend on their own resources for such information. This is the relevant product submarket, and insurance companies which do maintain their own investigatory staffs simply cannot be regarded as a part of it.

## MONOPOLIZATION OF THE INSURANCE REPORTING INDUSTRY AND THE NONLOCAL CREDIT REPORTING MARKET

■ ■ There are two elements which comprise the offense of monopolization: (a) the possession of monopoly power by the defendant in the relevant market, and (b) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence solely of a superior product, business acumen or historical accident, United States v. Grinnell Corp., *supra*. Actual exclusion of competitors is not necessary to the offense of monopolization. American Tobacco Co. v. United States, 328 U.S. 781 (1946). Neither is it necessary to find a specific intent to restrain trade or to build a monopoly. "It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements." United States v. Griffith, 334 U.S. 100, 104, 68 S.Ct. 941, 944, 92 L.Ed. 1236, 1242 (1947).

■ A party has monopoly power if it has, over "any part of the trade or commerce among the several states" a power of controlling prices or unreasonably restricting competition. United States v. E. I. du Pont de Nemours & Co., *supra*.

■ The size of the company and the portion of the market controlled by it are, of course, the starting blocks for the determination of the presence of monopoly power. As mentioned above,

RCC controls 85% of the life and health insurance reporting market, in and of itself enough to arouse strong suspicions of monopoly power. The same is true of the fire and casualty insurance reporting market where RCC dominates in light of the fragmentation and concomitant weakness of the competition.

▬▬▬ RCC contends that its size is not the consequence of any systematic effort to monopolize, but the legitimate result of internal growth. It is true that RCC has achieved its size through internal growth, but "the question is not how the defendants acquired their position of leadership, but, rather, whether that position gave them monopoly control over the market." Banana Distrib. v. United Fruit Co., 162 F.Supp. 32 (S. D.N.Y.1958). Neither size nor monopoly power, each standing alone, constitutes an offense under the Sherman Act. "It is the wrongful use and exercise of that power which is proscribed by section 2 of the Act." Case-Swayne Co. v. Sunkist Growers, Inc., *supra*. The acid test is whether defendants control the price and competition in the market for such part of trade or commerce as they are charged with monopolizing. *Id.* And where, as here, that is true, "an intention to monopolize in a proper case may be assumed." United States v. E. I. du Pont de Nemours & Co., *supra*, 351 U.S. at 392, 76 S.Ct. at 1005, 100 L. Ed. at 1279.

▬▬ Again, this is an assumption which is not necessary to a finding of monopolization. From the outset of CBR's announced plans to go into insurance reports, CBI's president was vehemently opposed to such a move. The strongest evidence indicative of RCC's intent to preserve its monopoly is its illegitimate offspring, CMS; but the most revealing single item is an internal CMS memorandum which expresses the apprehension of top management that "left unchecked" CBR might "absorb a portion of the insurance reporting market." The evidence clearly leads to the conclusion that RCC is a monopolist,

that it has deliberately traveled a course which will enable it to maintain that monopoly, and, consequently, has run afoul of Section 2 of the Sherman Act in that regard. This analysis is equally true of its effective and encroaching hold on the nonlocal credit reporting market, where RCC–RCA and its newly acquired bureau affiliates share 21% of the national market and are the unquestionably dominant group in certain regions of the nation, e. g. Southeast, Washington, D. C. area, and San Francisco Bay area.

## ATTEMPTED MONOPOLIZATION OF THE NONLOCAL CREDIT REPORTING MARKET

▬▬ CBR contends that defendants are guilty of attempted monopolization in violation of Section 2 of the Sherman Act in that defendants have made moves in the direction of eliminating competition in the nonlocal credit reporting market in the United States relating to the relevant product and geographical markets. The essence of this charge is not that monopolization is a *fait accompli*, but that defendants have manifested a specific intent to do what the law forbids. Times-Picayune Publishing Co. v. United States, *supra*.

CBR points to two policies of defendants they say are indicative of specific intent to monopolize: (a) the launching of CMS as a below cost operation and (b) the ever-continuing acquisitions of local credit bureaus.

CMS was announced as a new subsidiary the purpose of which was to perform a marketing function for all credit bureaus, whether owned by CBI or not. As initially announced, the marketing program of CMS was precisely the same as CBR's except that the CMS commission rate was to be 10% as opposed to CBR's 15% and the CMS prices to the customer averaged five cents less per report than CBR's. The original CMS program set forth in the first CMS contract mailed to credit bureaus in October, 1970, was revised after the filing of

this suit pursuant to a letter and second contract mailed to the bureaus on February 1, 1971. At that time, CMS announced that it would no longer sell reports for bureaus on a commission basis but that it proposed, alternatively, to purchase credit reports from local bureaus and then resell them to nonlocal credit grantors.

As a matter of timing, RCC's decision to launch CMS followed CBR's corporate reorganization and its plan to become profit-oriented in order to strengthen its entry into new markets. CMS president, Mr. Donald Rutherford, testified that he opposed CBR's decision to change its format through corporate reorganization. Further, Mr. Rutherford based his opposition to CBR's reorganization on CBR's planned entry into insurance reporting.

CBR's most serious concern regarding CMS is that it will be forced into a price war for the sale of nonlocal credit reports. This, of course, in itself has no antitrust consequences, but the evidence indicates that CMS cannot make a profit at a 10% commission rate and would, in fact, be operating at a loss. The evidence further indicates that RCC was not only aware that CMS would operate at a loss, but that they put their blessings upon its doing so. The entire approach to researching the financial viability of CMS before its formation smacks of a most unprofessional and lackadaisical technique. Illustrative of this point is the fact that Mr. Perkins, the person in charge of the research, had no expertise nor experience in the area of corporate analyzation; none of the price analyses were checked according to actual pricing records; Mr. Perkins was told by his superior that he must show a profit for CMS. One last factor is indicative of the ill-fated "profit notice" of CMS, namely, the below cost price of CMS reports were to be offered to only six large companies.

Other evidence indicates that CMS was not designed to be a profit-making venture. Various RCC officials have said publicly that they expected CMS to lose money. In addition, RCC has proclaimed that CMS will compete directly with RCC and RCA. But, yet, for each item of business which CMS might take away from RCC or RCA, CMS would gain only ten cents on the dollar while RCC or RCA would be losing the entire dollar.

From these facts, it is patently obvious that CMS was conceived as a pied-piper to lead unwary credit bureaus into the trap of doing business exclusively with CMS because of the lure of its attractive prices. Once all competition was eliminated however, these same credit bureaus would find themselves paying the prices set by the successful monopolist and thus dancing to his music. Of course, CMS could not gain these ends were it not for the huge volume of its parent corporation which has both the size and the money to bail it out while it is in the process of eliminating competition not only from CBR, but all other companies who do business in the nonlocal credit reporting market. This, therefore, is the pattern classically followed by the antitrust predator: the large, lucrative, influential business having an insatiable appetite to consume the small but growing thorn in its flesh. In Ovitron Corp. v. General Motors Corp., 295 F.Supp. 373 (S.D.N.Y.1969), it was said:

> "Pricing below cost is a severely anti-competitive tactic frequently engaged in by corporations with significant resources to drive weaker competitors from the field. While the consumer may be the immediate beneficiary of the price struggle, if the tactic succeeds he will eventually be subject to the economic strength and therefore the discretionary pricing of the survivor. In the meantime, competition will be driven out, not by the superior efficiency of the larger entity, but rather by the greater resources which enable it to sustain temporary losses for a longer time.

> " . . . There is little doubt that if a monopolist, other than a natural

monopolist, were to engage in below-cost pricing with the purpose of acquiring or maintaining a monopoly, Section 2 would be violated."

The timing of the announcement of CMS, the circumstances under which Perkins went about preparing the cost analysis, and the attitude of his superiors together with the inferences created by the fact that it operates at a loss compels the conclusion that defendants had the requisite specific intent to monopolize the nonlocal credit reporting market. This case demonstrates an attempt by a monopolist in one area, i. e., insurance reporting, to nose into a second market, so that past monopolistic success both enhances the probability of future harm and supplies a motivation for further forays. *Cf.* Times-Picayune Publishing Co. v. United States, *supra.* "An enterprise that by monopolizing one field, . . . has monopolized the second field in violation of § 2 of the Sherman Act." United States v. United Shoe Machinery, 110 F.Supp. 295 at 346 (D.Mass.1953). "If monopoly power can be used to begat monopoly, the Act becomes a feeble instrument indeed." United States v. Griffith, *supra,* 334 U. S. at 108, 68 S.Ct. at 946, 92 L.Ed. at 1244.

Not much need be said concerning CBI's acquisition of credit bureaus as evidence of specific intent. It is sufficient to say that there is ample support in the record for the finding that many of the acquisitions were expressly made in various localities for the purpose of eliminating competition. Typical of the evidence in this regard is the deposition testimony of Mr. Rutherford concerning CBI's acquisition of a bureau in Forest Park, Georgia, which is on the outskirts of Atlanta and competed to some extent with Retail's Atlanta bureau. When asked if the bureau in Forest Park was acquired in order to eliminate competition, Rutherford conceded that elimination of competition might have been the reason, *though only in the sense that an elephant might step on an ant on the way toward a goal.* With that statement, he said it all.

## THE GROWTH OF CBI AND SECTION 7 OF THE CLAYTON ACT

In the early 1960's, RCC, not achieving the internal growth it desired in the credit reporting business, embarked on a program of acquisitions. Since 1966, RCC through its subsidiary, CBI, has acquired outright ownership in excess of 100 credit bureaus, located primarily in the southeastern United States and on the Pacific Coast. Prior to its acquisition of the Frances Smith chain of bureaus, both CBI and Francis Smith owned more credit bureaus than their nearest large competitor, the Chilton Corporation. Thus, that acquisition by CBI left it in a role of undisputed supremacy in the terms of bureaus owned and is, of course, an indication of the trend toward centralization in an industry which is becoming decreasingly characterized by small, independent, locally-owned credit bureaus. Most, if not all of the bureaus acquired by RCC are members of CBR and together own about a 5% interest in CBR. Thus, CBR believes itself to be threatened with the creation of large geographical gaps in its ability to offer nationwide coverage, a deficiency in its reporting system which almost certainly will cause its customers to turn to other services. Of course, CBI-owned bureaus can be expected to turn to CMS to provide the services now provided for independent bureaus by CBR. On the basis of this set of conditions, CBR contends that the effect of these acquisitions, past and future, may be to substantially lessen competition in the nonlocal credit reporting business in the United States, though the pinch at present is being felt on the Pacific Coast and the Southeast.

The basic purpose of the antimerger provision of the Clayton Act was "to prevent economic concentration in the American economy by keeping a large number of small competitors in business." United States v. Von's Gro-

cery Co., 384 U.S. 270, 275, 86 S.Ct. 1478, 1481, 16 L.Ed.2d 555 (1966). The elements of proof in establishing Section 7 violations are somewhat less stringent than proving monopolization under Section 2 of the Sherman Act. First, unlawful intent to lessen competition is not requisite to the proof of a Section 7 violation, United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586 at 607, 77 S.Ct. 872 at 884, 1 L.Ed.2d 1057 (1957), but the existence of unlawful intent is an aid in predicting the probable future conduct of the parties and thus the probable effects of the acquisition. Brown Shoe v. United States, *supra,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d at 538, n. 48. Secondly, it must be observed that while the Sherman Act was intended to cure the disease of monopolization once it had struck, Section 7 of the Clayton Act was intended as preventative medicine, i. e., the antimerger provision was intended as a tool by which any combination which tended substantially to lessen competition or create a monopoly could be arrested in its inception, Brown Shoe Co. v. United States, *supra,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d at 517. It is not necessary that competition actually suffer, for Congress, by the use of the carefully chosen language "may be to substantially lessen competition," indicated its concern for probabilities, not certainties. United States v. El Paso Natural Gas, 376 U.S. 651, 658, 84 S.Ct. 1044, 12 L. Ed.2d 12 (1964).

■ While it is true that the most common application of Section 7 is to a merger between two large corporations, the effect of which would with one stroke of the pen, significantly enhance the acquiring corporation's share of the market, it is clear that Section 7 similarly prohibits a series of acquisitions which would result in the same end. As the House of Representatives Report on the 1950 Amendment to the Act reflects:

"Acquisition of stock or assets may have a cumulative effect, and control of the market . . . may be achieved not in a single acquisition but as a result of a series of acquisitions. The Bill is intended to permit intervention in such a cumulative process when the effect of an acquisition may be significant reduction in the vigor of competition."

H.R.Rep. No. 1191, 81st Cong., 1st Sess. 8 (1949). *See also* S. Rep. No. 1175, 81st Cong., 2d Sess. 5 (U.S.Code Cong. Service, p. 4297) (1950). This view has been adopted by the courts, United States v. Pennzoil Co., 252 F.Supp. 962, 983 (W.D.Pa.1965). As the district court in United States v. Brown Shoe, *supra,* put it:

"We can only eat an apple a bite at a time. The end result is the same whether it is done by quarters, halves, three-quarters, or the whole, and is finally determined by our own appetites. A nibbler can soon consume the whole with a bite here and a bite there. So, whether we nibble delicately, or gobble ravenously, the end result is, or can be, the same."

This seems to describe exactly what defendants are doing in their continuing program of acquisitions.

■ Credit bureaus are the life blood of the CBR organization. CBR was created to serve the bureaus which hold membership in it. These bureaus must remain independently owned for CBR to remain in business. If defendants continue to acquire bureaus at the same rate they have done so since 1966, one day in the not-too-distant future, the management of CBR will awake to find the company out of business. With an organization like CMS available, it defies common sense to say that RCC-controlled bureaus will depend on any entity other than CMS to reach the non-local credit reporting market. Thus, each bureau acquisition by RCC and/or CBI may be seen not only in terms of a horizontal merger, but in terms of a minute vertical merger as well. *See* Brown Shoe Co. v. United States, *supra.* This, when considered with the element of unlawful intent in

launching CMS, conclusively establishes a Section 7 violation.

## INJURY TO CBR

■ The statute which authorizes the remedy sought by CBR is 15 U.S.C. § 26:

"Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue. . . . ."

For a party to be entitled to permanent relief under this section, he need not demonstrate that he has suffered actual injury, but only a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

■ There can be little doubt that defendants' Clayton Act violations and their attempts to monopolize the nonlocal credit reporting market significantly threaten CBR and entitle it to injunctive relief on that basis.

■ Defendants, however, contend that even if it were found that RCC has monopolized the insurance reporting field, there is no evidence of injury to CBR in that it is not a likely entrant into that business. On the present record, this contention is without foundation. It is not necessary for CBR to have formulated a detailed plan of action for its entry into the insurance reporting business before it can be held to have sufficient antitrust standing to challenge RCC's monopolistic supremacy. In its member bureaus, most of which have indicated an interest in insurance reporting, CBR has available a nation-

wide network of offices through which its insurance reporting enterprise could be operated. CBR is not merely a likely entrant into insurance reporting; it is the only potential entrant that has made an appearance in the last fifty years in a field which is crying for competition. Yet, because of the predatory motivation behind bureau acquisitions and the launching of CMS, it finds the door to insurance reporting tightly closed. CBR is threatened with injury because of the existence of RCC's monopoly power in the field of insurance reporting.

## DEFENDANTS' ANTITRUST ACCUSATIONS AGAINST CBR

■ Defendants urge that CBR is itself guilty of conduct forbidden by Sections 1 and 2 of the Sherman Act. Under Section 1, defendants contend that CBR, by maintaining a uniform price which it requires member bureaus to follow in selling credit reports to nonlocal credit grantors, has engaged in illegal price-fixing as a coconspirator with its various member bureaus. There is no evidence of a conspiracy to fix prices. CBR is merely a sales agent for over 2000 independent credit bureaus from coast to coast. As such, it merely maintains control over its income by (a) determining its own commission rate and (b) determining what the return on that commission rate shall be by requiring its member bureaus to sell at uniform prices. The reports sold by the local bureaus on CBR's forms are in a sense CBR's product, just as surely as if CBR were engaged in a manufacturing endeavor. One who sells his product at a fixed price in absence of a conspiracy does not run afoul of Section 1.

■ Other CBR contentions in rebuttal to defendants' allegations of illegal price-fixing cannot be accepted. First, while it is true that compelling economic need may under certain rare conditions be a defense to price-fixing, Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933), the evidence of any such compelling need in this instance is unpersua-

sive. Secondly, CBR's argument that there is no competition among local bureaus, except in metropolitan areas, goes to the issue of the reasonableness of the price-fixing agreement, a forbidden inquiry as discussed in a previous portion of this opinion. Third, while it is true that in 1965 the Federal Trade Commission did give CBR a clean bill of antitrust health, the matters which were the subject of the FTC investigation are not in issue here.

▮ Defendants' reliance on Continental Wallpaper Co. v. Voight & Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909) is misplaced. There, a group of wallpaper manufacturers formed Continental Wallpaper Company and then proceeded to agree upon the prices at which the product would be sold. The Supreme Court held that in a suit by the company to collect on a sales agreement at the heart of the illegal scheme, the defendant could raise Sherman Act violations as a defense since the agreement sued upon had a very close relationship to the offenses raised in defense. The Court made it clear that it was *assuming* that the Sherman Act had been violated. *Continental Wallpaper* is distinguishable from the suit at bar. CBR's members did not participate in price-fixing. All of defendants' contentions based upon Section 1 of the Sherman Act must fail. This conclusion is inevitable because CBR is a sole entity and has not conspired with any other entity to fix prices, allocate territory, or refuse to deal.

Defendants' contention that CBR has violated Section 2 is similarly without merit. There is no evidence of any conspiracy to monopolize the nonlocal credit reporting market, nor is there sufficient evidence that CBR specifically intends to monopolize that market. As far as actual monopolization goes, the record does not establish that CBR possesses monopoly power in the nonlocal credit reporting market. When considered in terms of raw sales, the evidence shows that CBR, with its $15,577,195 volume for 1970 in a $40,330,796 market, has a

dominant position with a share of 38.-6%, but this does not constitute monopoly power. Of this $15,577,145 volume, however, the gross commissions to CBR amount only to about $2,000,000. Thus, when this market is measured in terms of income from these sales, CBR has a share of only about 8% as compared with about 27% for RCC and its affiliates. Either way, CBR does not have the power to exclude competition from the relevant market.

▮ The merits of the above matters have been discussed only because CMS has sought injunctive relief against CBR. Even if CBR were guilty of antitrust violations, such would not exonerate defendants for their antitrust violations nor deprive CBR of its right to injunctive relief. *See* Perma Life Mufflers, Inc. v. International Parts Corporation, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) and Kiefer-Stewart Co. v. Joseph E. Seagrams & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Although research reveals that no case has presented the situation where the plaintiff's antitrust illegality has been raised in opposition to an injunction, they make it clear that such defenses are not to be looked upon with judicial favor. And in cases where the concept of *in pari delicti* has been allowed, the facts were such that a judgment for the plaintiff would, in effect, have encouraged what the Sherman Act was designed to prevent. Perma Life Mufflers, Inc., *supra*. In *Kiefer-Stewart, supra*, where it was clear that the antitrust violation raised in defense to a suit for damages were completely independent of those upon which suit was brought, the defense was not permitted. In that case, it was said:

"If petitioner and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination

by respondents nor immunize them against liability to those injured."

Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition. Fortner Enterprises v. U. S. Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). The ends of that policy can best be served in this case by holding that the defense of "unclean hands" is not available to defendants.

## RULING TO BE GRANTED

An injunction in favor of CBR will be entered which will contain the following features:

1. Defendants shall be enjoined from withdrawing any credit bureaus owned by RCC and/or its affiliates from membership in CBR for a period of three years.

2. Defendants shall be enjoined for a period of three years from going forward in any manner with any new marketing plan or expansion program whereby RCC or any of its subsidiaries or affiliates would act as a sales agent for the sale of credit reports to nonlocal credit grantors.

3. Defendants shall be enjoined from additional acquisitions of local credit bureaus for a period of five years.

The first item of relief is necessary to remedy the effect of RCC's monopolization of the insurance reporting field and its attempted monopolization of the nonlocal credit reporting market. If CBR can be free from concern that its bureaus will not be withdrawn, it can proceed to establish its beachhead in insurance reporting. The same considerations are also behind the injunction against going forward with CMS or any similar organization. As for the third item of relief—the injunction against further acquisitions—this seems to be the least severe means by which the Sherman Act violations and the Clayton Act violations which have been found

may be remedied. The time limitation set forth in each item is not without precedent. See United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960). The changes which have taken place in the business of compiling information about people may justify reconsideration of the effect of new acquisitions at a time when there is a reversal of the present trend towards concentration. The court will retain jurisdiction in this cause and defendants may apply for an order modifying this injunction to permit any acquisition they feel that they can justify, or to shorten the restrictive periods in any of the items of relief. Similarly, CBR may apply for an order extending any or all of these periods if they can present evidence convincing the court that the time limitations should be so extended.

One requested item of relief not granted deserves some discussion. CBR requested that defendants be ordered to divest themselves of all credit bureaus acquired since 1966. As of 1968, no court had ordered divestiture in a private suit. Antitrust Developments, *1955–1968* (1968), p. 98. CBR has pointed to no case since where divestiture has been decreed in a private suit. It seems clear, however, that a federal court does have the power to decree divestiture, a form of injunctive relief within Section 16 of the Clayton Act. Burkhead v. Phillips Petroleum Co., 308 F.Supp. 120 (N.D.Cal.1970). The trend towards judicial favoritism of divestiture in private suits has been a very recent one. The arguments that. courts have no power to order divestiture under Section 16 have been sufficiently explored in Peacock, Private Divestiture Suits Under Section 16 of the Clayton Act, 48 Tex.L.Rev. 54 (1969), as well as the policy considerations which have been an obstacle to divestiture.

Whether divestiture is proper or not in any particular case is a matter which must depend upon a balancing of the equities in each instance. As was said in Julius M. Ames Co. v. Bostitch,

**798**

Inc., 240 F.Supp. 521, 526 (S.D.N.Y. 1965):

"Divestiture is a form of injunctive relief. It may or may not be appropriate, depending upon the circumstances. In American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387 (S.D.N.Y.1957), aff'd 259 F.2d 524 (2d Cir. 1958), relied upon by defendant, the district court denied divestiture on the ground that it was unnecessary. The Court of Appeals did not mention the subject, doubtless because plaintiff did not appeal.

"In Schrader v. National Screen Service Corporation, 1955 Trade Cas. ¶ 68,217 (E.D.Pa.1955), also cited by defendant, the court in its brief memorandum merely stated that it was generally recognized that 'considerations of policy are against decreeing divestiture' in private actions.

"Neither decision holds that divestiture may never be granted under any circumstances in a private action under Section 16. No case has been found that does so hold. I see no valid reason for accepting such a proposition. The statute does not distinguish between types of injunctive relief. Any type would seem to be permissible, when it is appropriate."

Divestiture, being the severe measure that it is, should be avoided when other forms of injunctive relief can adequately protect against the "threatened injury" within Section 16. Here, it is found that the injunctive relief fashioned above—the prohibition against withdrawal of bureaus and the restraint against new acquisitions coupled with flexibility in each item of relief as to the duration of the various restraints—is entirely sufficient to remove any monopolistic barriers to CBR's entry into the insurance reporting field and, at the same time, protect its role as a sales agent for local bureaus which desire to do business with nonlocal credit grantors. Moreover, it must be remembered that only a small portion of each local bureau's business is in the nonlocal cred-

it reporting market. Thus, to order divestiture would penalize the defendants in a major aspect of their business which has nothing to do with this suit. There is nothing in this record to warrant such a remedy with the attendant harsh consequences which would necessarily follow from it. All other relief requested by either party is denied. Each party will pay all costs incurred by it.

Following the guidelines set forth above, counsel for plaintiff will draft a decree and submit it to counsel for defendants for approval as to form within ten (10) days of the entry and filing of this opinion and order. Within five (5) days thereafter, counsel for defendants will either indicate their approval as to form or submit the proposed decree to the court without such approval, but with a written statement presenting the reasons why such approval as to form cannot be given. In the latter event, the court will direct the further procedure, if any. This opinion and order shall constitute the findings of fact and conclusions of law in this cause.