476 F.2d 989
 1973-1 Trade Cases 74,449
 CREDIT BUREAU REPORTS, INC., Plaintiff-Appellee-Cross Appellant,
v.
RETALL CREDIT COMPANY et al., Defendants-Appellants-Cross Appellees.
CREDIT MARKETING SERVICES, INC., Plaintiff-Appellant,
v.
CREDIT BUREAU REPORTS, INC., Defendant-Appellee.
 No. 72-1572.
 United States Court of Appeals,
Fifth Circuit.
 Rehearing and Rehearing En Banc Denied June 7, 1973.
 
 Leroy Jeffers, Charles T. Newton, Jr., Harry Reasoner, Houston, Tex., for Retail Credit and others.
 John H. Boman, Jr., Kent E. Mast, Atlanta, Ga., for Credit Marketing and others.
 William C. Harvin, Houston, Tex., King & Spalding, Atlanta, Ga., E. William Barnett, John L. Jeffers, Jr., William R. Burke, Jr., Houston, Tex., for appellee.
 Before JONES, GODBOLD and INGRAHAM, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 Credit Bureau Reports, Inc. (CBR) brought this anti-trust suit in the U. S. District Court for the Southern District of Texas, against Retail Credit Company (RCC) and its subsidiaries, seeking an injunction and a decree of divestiture under Sec. 16 of the Clayton Act (15 U.S. C. Sec. 26). CBR charged RCC with price fixing in the nonlocal credit reporting market[1] in violation of Sec. 1 of the Sherman Act (15 U.S.C. Sec. 1), with monopolization of the insurance reporting market[2] and attempted monoplization of the nonlocal credit reporting market in violation of Sec. 2 of the Sherman Act (15 U.S.C. Sec. 2), and with having violated Sec. 7 of the Clayton Act (15 U.S.C. Sec. 18) by acquisition of more than 100 local credit bureaus, which tended to lessen competition in the reporting markets.[3] CBR alleges that these asserted violations significantly threatened its operations in the nonlocal credit reporting market and its potential entry into the insurance reporting market where it would be a competitor of RCC.
 
 
 2
 After CBR's complaint was filed, Credit Marketing Services, Inc. (CMS), a subsidiary of RCC, brought suit in the U. S. District Court for the Northern District of Georgia, charging CBR with price fixing and monopolization in nonlocal credit reporting in violation of Secs. 1 and 2 of the Sherman Act and seeking injunctive relief under Sec. 16 of the Clayton Act. The Georgia federal court transferred CMS's suit to the Southern District of Texas where it was consolidated with the action filed by CBR.
 
 
 3
 The District Court, sitting without a jury, found that RCC had not fixed prices in the nonlocal credit reporting market but had violated Sec. 2 of the Sherman Act by monopolizing the insurance reporting market and by attempting to monopolize nonlocal credit reporting, and had violated Sec. 7 of the Clayton Act by acquiring the local credit bureaus. The court enjoined RCC from (1) withdrawing its local bureaus from membership in CBR for three years; (2) from going forward in any manner to compete with CBR for the marketing of nonlocal credit reports for three years; and (3) from acquiring additional local bureaus for five years. The court refused to require divestiture of the local bureaus RCC had acquired. As to CMS's complaint, the court found that, while owned by the local bureaus which provided the information it sold, CBR was a sole entity merely selling its own product, credit reports. The court held that CBR, therefore, had not violated the Sherman Act by conspiring with any other entity to fix prices, allocate territory, or refuse to deal.
 
 
 4
 RCC appeals from the order enjoining its activities and CBR cross-appeals from the refusal to order divestiture. We affirm on the basis of the District Court's opinion, Credit Bureau Reports, Inc., v. Retail Credit Co. et al., 358 F. Supp. 780 (S.D.Tex.1971), and of the following discussion.
 
 
 5
 On appeal the parties have focused upon three issues: the "prematurity" of the interest of CBR which the District Court found to be threatened and for which CBR was granted injunctive protection, the requisites of the showing of a causal nexus between that interest and the antitrust law violations found by the District Court, and the claim that CBR has engaged in illegal territorial allocation.
 
 
 6
 1. Prematurity.
 
 
 7
 Section 16 of the Clayton Act entitles private litigants to injunctive relief from threatened injury resulting from a violation of the antitrust laws. To obtain such relief the complaining party must prove that the alleged offender either already has violated the antitrust laws or that such violation is impending and that, because of this violation, he is threatened with loss or injury. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129, 152 (1969). A mere showing by the private plaintiff of a violation of the antitrust laws has no actionable significance because, while in a government action there need be established only an antitrust violation, a private litigant "'must not only show the violation of the antitrust laws, but show also the impact of the violations upon him,' i. e., some injury (or threatened injury where injunctive relief only is sought) proximately resulting from the antitrust violation." McKeon Construction Co. v. McClatchy Newspapers, 1970 Trade Cas. paragraphs 73, 212 (N.D.Cal.1969), quoting from Simpson v. Union Oil Company, 311 F.2d 764, 767 (9th Cir. 1963), rev'd on other grounds, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).
 
 
 8
 The District Court's grant of injunctive relief here was carefully premised upon three related determinations. First, it found that RCC had violated the antitrust laws by monopolizing the insurance reporting market, by attempting to monopolize the nonlocal credit reporting market, and by acquiring local credit bureaus. Second, it determined that CBR was a potential entrant into the insurance reporting market and that its interest as a potential entrant was protected by the antitrust laws. Third, the court determined that "defendants' Clayton Act violations and their attempts to monopolize the nonlocal credit reporting market significantly threaten CBR [by closing tightly the door to the insurance reporting market] and entitle it to injunctive relief on that basis," and that "CBR is threatened with injury because of the existence of RCC's monopoly power in the field of insurance reporting."
 
 
 9
 RCC's "prematurity" argument is essentially an attack upon the court's second determination, directed not at the correctness of the fact findings underlying it but at the sufficiency of those facts to establish that CBR was a potential entrant into the insurance reporting market. The evidence relied upon by the court related to the decisions of CBR executives to begin preparation for entry into the market, and to a survey conducted by CBR to determine local bureau interest in participation through CBR in insurance reporting. RCC contends that this evidence failed to establish that CBR was presently ready, willing, and able to enter the market. Also, RCC points to countervailing evidence relating to the existence of barriers, not caused by RCC, to CBR's actual entry into the market, and to acknowledgment by CBR that when suit was filed, it did not have a product acceptable to the insurance companies.[4] Additionally, RCC notes evidence showing that until recently CBR executives thought that the Fair Credit Reporting Act (15 U.S.C. Sec. 1681 et seq.) would impose upon local bureaus performing telephone investigations of potential insureds, legal duties and potential liability too onerous to accept.
 
 
 10
 RCC made the same arguments at trial, and the District Court correctly rejected them. The evidence relied upon was sufficient to establish that CBR had done enough to make its presence on the edge of the insurance reporting market have "competitive significance," notwithstanding whether it ever would or could be able to actually enter that market because of the existence of other barriers not caused by RCC. In United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1965), the government has sued for an order requiring El Paso to divest itself of Pacific Northwest, contending that the acquisition of Northwest had violated Sec. 7 of the Clayton Act by removing El Paso's potential competitor in the California gas market. The trial court found that Northwest could not have obtained a contract from California distributors, could not have received gas supplies or financing for a pipeline project to California and could not have put together a project acceptable to the regulatory agencies. 376 U.S. at 657-658, 84 S.Ct. 1044, 12 L.Ed.2d at 17-18. The Supreme Court, however, held that those findings were irrelevant, 376 U.S. at 658, 84 S.Ct. 1044, 12 L.Ed.2d at 18, and that a Sec. 7 violation had been established because the mere existence of Northwest as a potential competitor on the edge of the California market-without regard to whether it would ever be able to actually enter that market-had "competitive significance" in the California market.
 
 
 11
 Similarly in Zenith Radio, supra, the Court reinstated injunctive relief the trial court had granted Zenith against continued participation by Hazeltine Research in English and Australian patent pooling arrangements which created barriers to Zenith's potential entry into those markets. 395 U.S. at 132-133 and n. 26, at p. 132, 89 S.Ct. 1562, 23 L.Ed. 2d 153 and n. 26, at 153. The relief was reinstated notwithstanding the Court's earlier holding that treble damages were properly denied because Zenith had not shown that its failures to enter those markets were proximately caused by the defendants' antitrust violations. The Court had noted that other restraints-Zenith's failure to develop a television set which could operate on the different signals transmitted in England, government trade barriers, and high shipping costs-existed to block Zenith's actual entry. 395 U.S. at 125-126, 129, 89 S. Ct. 1562, 23 L.Ed. 149-151. See also United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973).
 
 
 12
 2. Causation.
 
 
 13
 In finding that the antitrust laws were violated by RCC's acquisitions of local credit bureaus and its attempt to monopolize, the District Court assessed the effects of those acts in the nonlocal credit reporting market, while the interest protected by the injunction was CBR's potential entry into the insurance reporting market. RCC contends that the causal nexus required by Sec. 16 of the Clayton Act between the antitrust violations and the interest of the private litigant allegedly threatened cannot be established where the violations and the threatened interest reside in different markets. This argument must be rejected.
 
 
 14
 The District Court expressly found that it is necessary to enjoin RCC from withdrawing its local bureaus in order to allow CBR to establish a beachhead in insurance reporting. To effectively compete on a national scale, that is, by selling reports on prospective insureds residing in one section to prospective insurers whose decisions to insure are made at offices located in other sections, CBR would necessarily rely on the nationwide coverage created by the geographical dispersion of its member locals. But, as CBR contended, RCC, by merely withdrawing from CBR membership the locals it owns (which constitute about 5% of CBR's membership and accounted for 12.5% of CBR's gross revenue in 1970 and which are concentrated in several metro-areas), could create large geographical gaps in CBR's ability to service the needs of national insurance companies. To hold here that CBR must wait for injunctive protection until RCC has actually withdrawn its locals, acts which would have immediate effects in the same market for which CBR is a potential entrant, would be to strip this private plaintiff of the remedy clearly granted it by Sec. 16 for impending violations, see Zenith Radio, supra, and relegate Sec. 16 to cases of post-horse barn door closings. Furthermore it would contravene the congressional policies expressed in Sec. 7 of the Clayton Act of protecting against the elimination of potential competitors and of arresting the anticompetitive effects of Sec. 7 violations in their incipiency. "[T]here is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before Sec. 7 can be called into play." F. T. C. v. Procter & Gamble, 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303, 309 (1967).
 
 
 15
 Our conclusion that the court was correct in finding sufficient causation to warrant injunctive protection for CBR's potential entry into insurance reporting is further supported by the fact that, while the court did not so find, the record would fully support a determination that RCC's acquisitions also had the Sec. 7 proscribed effect of substantially lessening competition in the insurance reporting market.
 
 
 16
 Moreover, even if we thought sufficient causation was not shown between the violations found in the nonlocal credit reporting market and CBR's potential entry into the insurance reporting market, we would not reverse. The District Court also premised its grant of relief upon the alternative causation determination that "CBR is threatened with injury because of the existence of RCC's monopoly power in the field of insurance reporting." This links CBR's threatened interest to an antitrust violation found by assessing its effects in the same market as CBR's interest.
 
 
 17
 3. Illegal territorial allocation by CBR.
 
 
 18
 RCC contends that in light of the Supreme Court's decision in United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), decided after judgment was entered for CBR, the court erred in determining that CBR was a sole entity and therefore did not violate Sec. 1 of the Sherman Act by generally restricting membership to only one local credit bureau in each city.[5] That error requires a reversal, RCC argues, because Sec. 16 of the Clayton Act permits injunctions to be granted in private actions only "when and under the same conditions and principles as injunctive relief . . . is granted by courts of equity," and courts of equity do not grant injunctions to protect an unlawful scheme. We do not agree that reversal is required, even if Topco, supra, compels a different result on the issue of CBR's alleged illegal territorial allocation and even if we assume that the doctrine of unclean hands is still available to RCC as a means of defending against a request for injunctive relief under the antitrust laws.[6] What we said in Sunshine Packers, Inc. v. American Oil Co., 395 F.2d 86 (5th Cir. 1968), in reliance upon Kelly v. Kosuga, 358 U. S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), concerning the restricted ambit of the in pari delicto defense[7] is equally applicable here. See especially, Sunshine Packers, supra, 395 F.2d at 87-88 and n. 1, at 88. The illegality vel non of CBR's conduct in allocating territories would not constitute a defense against the injunctive relief unless that injunctive relief itself enforces, maintains, or protects "the precise conduct" by CBR allegedly made unlawful by the antitrust laws. Kelly v. Kosuga, supra, 358 U.S. at 520-521, 79 S.Ct. 429, 3 L.Ed.2d at 478-479. There has been no showing here that CBR's alleged territorial allocation is supported by the order enjoining RCC from withdrawing its local bureaus, from going forward with its own marketing service, and from acquiring additional local bureaus.
 
 
 19
 Affirmed.
 
 
 
 [1]
 The court defined the nonlocal credit reporting market as the servicing of needs of nonlocal credit grantors, such as oil companies, mail-order houses, bank chargecard systems, for information collected by local credit bureaus relevant to credit ratings of locally residing individuals
 
 
 [2]
 The insurance reporting market was defined by the court as the gathering and the sale to insurance companies of information about prospective insureds, to guide the companies in making underwriting decisions, i. e., the determinations of whether to issue policies and, if so, what premiums to charge. As defined by the court, this market includes both reports used for life and health policies and fire and casualty policies
 
 
 [3]
 CBR alleged that these acquisitions had the Sec. 7 proscribed effect of lessening competition in both nonlocal credit reporting and insurance reporting. The court, however, determined that RCC's acquisitions violated Sec. 7 by assessing their effect only in the nonlocal credit reporting market. See infra Part 2, at 993
 
 
 [4]
 RCC contended at trial that insurance companies would not accept reports prepared in the usual manner of CBR's credit reports, from telephone conversations. RCC's insurance reports were prepared from data obtained through its investigators' personal interviews
 
 
 [5]
 In Topco the Court held that a cooperative purchasing association of grocery chains, owned by its members who possessed power to exclude competitors operating in their areas from membership, had engaged in per se illegal territorial allocation
 
 
 [6]
 See Skil Corp. v. Black & Decker Mfg. Co., 351 F.Supp. 65 (M.D.Ill.1972) and compare Singer v. A. Hollander & Son, 202 F.2d 55 (3rd Cir. 1953); Graham v. Triangle Publications, 233 F.Supp. 825 (E.D.Pa.1964); and Louisiana Petroleum Retail Dealers v. Texas Co., 148 F. Supp. 334 (W.D.La.1956) with Hawaiian Tuna Packers v. International L & W Union, 72 F.Supp. 562 (D.Haw.1947); and Magna Pictures Corp. v. Paramount Pictures Corp., 265 F.Supp. 144 (C.D. Cal.1967)
 
 
 [7]
 Prior to its demise in Perma Life Mufflers, Inc., v. International Parts Corporation, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). See also Hobart Bros. v. Gilliland, 471 F.2d 894, n. 5 at 901 (5th Cir., 1973). The District Court relied upon Perma Life to reject RCC's attempted defense, even if CBR were guilty of antitrust violations