AMERICAN MEDICORP, INC., Plaintiff,

v.

HUMANA, INC., Defendant.

Civ. A. No. 77–3392.

United States District Court,
E. D. Pennsylvania.

Dec. 19, 1977.

Thomas A. Masterson, William J. Taylor, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff; Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel.

Lee Calligaro, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for defendant; Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., of counsel.

## OPINION AND ORDER

FOGEL, District Judge.

### I. FACTUAL AND PROCEDURAL HISTORY OF THE CASE:

We noted in our first opinion in this matter, filed on November 11, 1977, D.C., 445 F.Supp. 573, that a proposed tender offer by Humana, Inc. (Humana), to the shareholders of American Medicorp, Inc. (Medicorp), pursuant to the provisions of § 14 of the Securities Exchange Act of 1934 had triggered major litigation in three United States District Courts (Southern District of New York, Eastern District of Pennsylvania, and Northern District of Illinois), as well as in the Chancery Court of the State of Delaware.

In that prior Opinion and Order, we determined: (1) that those aspects of the case then before us which dealt with issues of securities law be transferred to the Southern District of New York; and (2) that those matters which had been brought under the so-called West Virginia "cornering the market" law be dismissed. We retained jurisdiction over those claims which stem from plaintiff's contention that a successful tender offer by Humana would violate § 7 of the Clayton Act, 15 U.S.C. § 18, and §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. We are now prepared to rule on Plaintiff's request for an injunction preliminarily enjoining Humana from making the tender offer to Medicorp's shareholders; injunctive relief is sought under § 16 of the Clayton Act, 15 U.S.C. § 26.

To put the matter in focus, it is helpful to review briefly the chronology of events; that sequence follows:

(1) On September 27, 1977, Humana sent a letter to the Board of Directors of American Medicorp, which announced Humana's proposed offer to Medicorp shareholders. The Board responded by issuing two statements on September 29, 1977;

(2) On September 30, 1977, Humana filed a complaint in the Southern District of New York, alleging that Medicorp's press releases were fraudulent and manipula-

tive acts in violation of the Securities Exchange Act of 1934, (*Humana, Inc. v. American Medicorp, Inc.*, 77 Civ. 4809, assigned to the Honorable Morris E. Lasker);

(3) On October 3, 1977 Medicorp began this action by filing a complaint which stated a claim for violation of the federal antitrust laws, a second claim for violation of the West Virginia "cornering the market" law, and asked for a preliminary injunction to block the tender offer;

(4) Three days later, on October 6, 1977, Medicorp filed a Motion for Leave to Amend the Complaint. The proposed amended complaint which was attached to that motion repeated the claims of the original complaint, and added five claims founded on purported violations of federal and state securities laws and state fiduciary principles;

(5) Following a pre-trial conference, on October 12, 1977, we issued an Order which set a schedule for briefs, oral argument and a hearing on the application for the preliminary injunction. Pursuant to that Order, Humana filed its brief on October 17, 1977, and Medicorp filed its briefs on October 19 and 20, 1977;

(6) On October 13, 1977, Humana filed a Motion to Transfer to the Southern District of New York, a Motion to Dismiss for Improper Venue, a Motion to Dismiss for Failure to State a Claim, and, in the alternative, a Motion for a More Definite Statement;

(7) On that same day, we entered an Order granting expedited discovery with priority for that discovery which was necessary to prepare for argument of the venue motions;

(8) On October 18, 1977, we entered a second discovery Order which spelled out the method for handling confidential materials;

(9) On October 21, 1977, counsel engaged in extensive oral argument of all of the motions before the Court;

(10) Both parties then filed supplemental briefs on October 25 and 26, 1977;

(11) On October 28, this Court entered an Order disposing of all pending Motions as follows: (a) defendant's Motion to Dismiss was denied as to the federal antitrust claims, but granted with respect to the West Virginia "cornering the market" claim; (b) the alternative Motion for a More Definite Statement was denied; (c) the Motion for Transfer was granted as to all securities law claims, (both federal and state), and denied as to the antitrust and breach of fiduciary duties claims; (d) the Motion to file an amended complaint was denied for mootness;

(12) Humana then moved the Court to reconsider retaining the *Sixth Claim,* which the parties argued before this Court on November 7, 1977;

(13) We granted the Motion to Reconsider that same day;

(14) The preliminary injunction hearing began on November 8, 1977, and was concluded on November 23, 1977; the hearing produced over 2,000 pages of transcript adduced from 21 witnesses, and 128 exhibits;

(15) At the conclusion of the evidentiary hearing, the parties were directed to file briefs and reply briefs prior to oral argument, which was scheduled and heard on December 2, 1977; and

(16) On that date, after oral arguments were completed, we stated that an Opinion and Order on the preliminary injunction issues would be rendered on December 16, 1977. At that time, we also said that any steps contemplated by Humana in furtherance of the tender offer before the entry of the Order on December 16 should be reported to this Court and counsel for Medicorp, prior to initiation of the steps contemplated, so that appropriate action could be taken, if we thought it necessary; Humana's counsel did keep the Court and Medicorp's counsel informed of developments; however, judicial intervention was not necessary.

On the basis of the entire record, including: (1) the Notes of Testimony; (2) the exhibits; (3) the proposed finding of facts and conclusions of law submitted by the

parties; (4) the voluminous briefs filed with us; and (5) the matters raised at oral argument, we have concluded that, at this juncture, we will not issue a preliminary injunction. As noted, however, in the Order which accompanies this Opinion, detailed procedures have been established so that the Court in furtherance of its continuing jurisdiction may monitor all activities that would advance the tender offer until such time as the final hearing, which we will schedule to begin on January 23, 1978, (or sooner if both parties are prepared to go forward before that date), is concluded, and a definitive final decree is entered; that decree in turn will be filed, at the latest, three weeks after the date of the conclusion of the final hearing, or before that time, depending on the length of the hearing, additional evidence adduced, and new theories offered, if any. Our reasons for this action follow. Although this Opinion shall constitute our findings of fact and conclusions of law within the purview of F.R.C.P. 52(a), we also append hereto and incorporate herein numbered findings of fact and conclusions of law as Exhibits "A" and "B" respectively, which appendices constitute part of this Opinion, and support for the accompanying Order.

## II. THE STRUCTURE OF THE HOSPITAL INDUSTRY IN THE UNITED STATES:

Both Medicorp and Humana are investor owned business corporations; their shares are traded on major stock exchanges. They are both engaged in the operation of short-term, acute-care community hospitals through outright ownership, management contracts (in the case of Medicorp), and lease arrangements. Plaintiff contends that the combination of these two firms would tend to lessen competition substantially in the development of new and re-placement hospital facilities in the nation as a whole, and would also eliminate competition in the delivery of hospital services to doctors and patients in Broward County, Florida, Jefferson County, Kentucky, and the town of Bluefield, West Virginia. Before considering these claims, and the crite-

ria which govern the grant or denial of a preliminary injunction under Section 16 of the Clayton Act, a brief overview of the current state of the hospital industry is necessary.

Historically, hospitals have been divided into two categories: non-profit and proprietary. Non-profit institutions include university teaching hospitals, those operated by religious orders, and those operated by some form of local or state government. Proprietary institutions, to the extent they existed, were traditionally locally owned, either by a small group of physicians or by other investors.

Hospital management companies, (proprietary chains), began to surface about 1967, as a factor in health care delivery. This was due in part to the spiral of increased costs of health care, which created a need for organizations that could achieve cost savings through central planning, quantity purchasing, and centralized management; the advent of Medicare and Medicaid as well as new dimensions in third party payments, also were an impetus to the establishment and growth of these chains. *See,* Steinwald and Neuhauser, *The Role of the Proprietary Hospital,* 35 Law & Contemp.Prob. 817 (1970).

In the late 1960's, public awareness of the cost of health care delivery led many states to require a showing of actual need before allowing new construction of hospital facilities, in order to control costs and prevent needless duplication of these facilities. *See,* Havighurst, *Regulation of Health Facilities and Services by "Certificate of Need",* 59 Va.L.Rev. 1143 (1973). Because voluntary planning could only occasionally succeed in curbing the spiralling cost of health care delivery, hospitals were required to secure Certificates of Need before they could make substantial capital expenditures. As a practical matter, obtaining a Certificate of Need has become an economic necessity as a condition precedent to the construction or replacement of hospital facilities; without it, the institution is ineligible for Medicare, Medicaid and many private third party payments.

In 1974, Congress enacted the *National Health Planning and Resources Development Act,* 42 U.S.C. § 300k, *et seq.* Section 300*l* requires the establishment of *Health Service Areas* that demarcate a geographic area in which to plan. The actual boundaries of each *Health Service Area* are ultimately determined by the Secretary of the Department of Health, Education and Welfare (HEW). Establishment of a *Health Service Area* initially requires designation of appropriate boundaries within the state by the governor of that state, in accordance with the criteria set forth in 42 U.S.C. § 300 *l*(a); in so doing, interstate *Health Service Areas* must be taken into account. This designation establishes the boundaries of the *Health Service Areas,* unless the Secretary of HEW determines that the boundaries do not meet the requirements of 42 U.S.C. § 300*l*(a). These boundaries are subject to continuing review in order to assure compliance with the criteria set forth in subsection (a).

The *National Health Planning and Resources Development Act* also provides for the establishment of a *Health Systems Agency* for each *Health Service Area.* A *Health Systems Agency* must be a non-profit corporation designed to provide expertise in health planning, development and use of health resources for the *Health Service Area.* To discharge this duty, a *Health Systems Agency* is required to develop a *Health Systems Plan* to assure that health care: (a) is accessible to residents of the Area; (b) is responsive to the unique needs of the Area; and (c) is consistent with national health planning policy. To implement the *Health Systems Plan,* a *Health Systems Agency* must seek public and private assistance in formulating its *Health Systems Plan.*

Section 300m requires the Secretary of HEW to enter into agreements with state agencies to administer health planning and development functions. To assure that federal funds under the Medicaid and Medicare Programs are not used to support unnecessary capital expenditures, state agencies must determine whether or not a need exists for those services within the goals set by the *Health Systems Plan.* They are required to review and approve all proposed expenditures for health care which: (1) exceed $100,000.00; (2) change existing bed capacity; or (3) change the services of existing facilities, see 42 U.S.C. §§ 300m–2(a)(4), 1320a–1. *For all practical purposes all of this means that no new or replacement hospital can be built without prior government approval.*

Given this background of the structure of the industry, plaintiff claims that the merger of the second and third largest proprietary chains, (measured by the number of licensed beds), *would substantially lessen competition in one distinct line of commerce—that which is concerned with the acquisition, development and management of short-term, acute-care hospitals throughout the nation as a whole, and particularly in regions of rapid population growth;* plaintiff also contends that the same result would obtain in a second line of commerce—the delivery of hospital services in three local markets.

## III. THE STANDARDS WHICH GOVERN ISSUANCE OF A PRELIMINARY INJUNCTION UNDER SECTION 16 OF THE CLAYTON ACT:

A plaintiff who seeks preliminary injunctive relief to restrain a proposed tender offer in the context of private antitrust litigation must show: (1) *a reasonable probability of success on the merits; AND* (2) *irreparable harm, pendente lite, if the relief requested is not granted. Allis-Chalmers Mfg. Co. v. White Consolidated Industries,* 414 F.2d 506 (3d Cir. 1969), *cert. denied,* 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970). *See also, A. L. K. Corporation v. Columbia Pictures Industries, Inc.,* 440 F.2d 761 (3d Cir. 1971). The determination of the merits of antitrust claims frequently raise complex legal questions, and as in the instant case, invariably require a review of an extensive record. Accordingly, we will first address ourselves to the relatively straightforward issue of irreparable harm.

## A. THE STANDARD REQUIRED TO BE MET IN ORDER TO ESTABLISH IRREPARABLE HARM:

Plaintiff has alleged that it will be irreparably harmed in numerous ways if Humana's tender offer is not enjoined. *First*, Medicorp states that it will cease to exist as a viable economic entity. Humana cannot seriously dispute this fact, for the expressed intent of Humana is to acquire Medicorp and integrate its operations into Humana's. (SEC Form S–7 at 19). However, it is almost inconceivable that plaintiff would suffer this injury before a final decision on the merits in the instant case, since we will hold an expedited final hearing commencing on January 23, 1978, (or sooner, if the parties are prepared to go forward before that date), and indeed, will issue a definitive Order within three weeks of the conclusion of that hearing, or sooner, depending on the length of the hearing, additional evidence adduced, and new theories offered, if any.[1]

Plaintiff also urges that it will suffer the following immediate injury once the offer is presented to its shareholders: (1) upper-level management personnel will seek other employment because they fear they would be fired by Humana, if it is successful; (2) lending institutions will be reluctant to advance Medicorp capital funds, *pendente lite*; and (3) Medicorp's ability to obtain additional development and management contracts will be impeded. In addition, Medicorp argues that Humana will have access to Medicorp's trade secrets once it obtains representation on Medicorp's board of directors. While there may be some plausibility to these contentions, it is certainly clear that the notoriety given to this litigation, in and of itself, could generate these adverse effects; obviously, we cannot enjoin media coverage of this litigation because publicity may be detrimental. Hence, we must analyze the claimed injury in light of existing realities in order to determine if a case has been made for injunctive relief.

Humana, on the other hand, contends that it will be an injured party through its inability to "draw down" its own financing, should a preliminary injunction issue, because it contends that such a situation could result in a total loss of the money already expended in its attempt to effectuate the tender offer. Humana also claims that issuance of the injunction would sound the "death knell" of the offer, irrespective of the final resolution of the controversy by the Court.

Although in balancing the scales we believe that Medicorp's position is more appealing than Humana's with respect to possible harm it may suffer, our inquiry cannot stop there. We must look beyond the interests of these two corporate litigants, and consider the interest of those persons who are not parties to this litigation, and also the public interest.[2]

While the parties before us clearly are proper parties to join battle, we must not lose sight of the fact that the interests of the officers and the board of directors of a corporation resisting a takeover, albeit well motivated and sincere, may not necessarily be the same as the interests of the shareholders of the corporation. The tender offer presents an additional dimension to those which are present in a traditional battle between corporations for a share of the market. While we have held in our

---

1. The dissolution of Medicorp is the last of a series of steps in accomplishing the ultimate goal of a successful tender offer: (a) Humana must first make the actual tender offer; (b) a significant number of Medicorp shareholders must tender their shares; (c) Humana must secure the approval of debt creditors before proposing a merger or sale of assets; (d) unless Humana acquires more than fifty per cent of the outstanding shares, approval of the proposal would have to be ratified by Medicorp shareholders.

2. Cf., *Systems Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131 (3d Cir. 1977); *Ammond v. McGahn*, 532 F.2d 325 (3d Cir. 1976); *A. O. Smith Corporation v. F. T. C.*, 530 F.2d 515 (3d Cir. 1976); *Oburn v. Shapp*, 521 F.2d 142 (3d Cir. 1975); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917 (3d Cir. 1974); *See also, Wright & Miller*, Federal Practice and Procedure: Civil § 2948.

prior Opinion in this matter, that this relatively new technique is one which comes under the umbrella of the antitrust laws, we cannot lose sight of the practical economic realities which are at the very heart of this controversy. Certainly, a very significant factor that weighs against the issuance of a preliminary injunction at this time is that an injunction would deprive Medicorp's shareholders of the opportunity to express their own views about where they want their money to go, and to make their own decisions as to whether they want to opt in or opt out!

Our awareness of the consequences of either the grant or denial of a preliminary injunction has impelled us to set a final hearing promptly, as per the Order which accompanies this Opinion, on January 23, 1978, or sooner if the parties are ready to proceed, and to issue a definitive decree within three weeks after the completion of that hearing, or sooner if the circumstances permit. This is so because the failure of courts to move swiftly after a preliminary hearing has often resulted in grave harm to the parties. The date for the final hearing has purposefully been set in order to permit the parties to have a definitive decision of this court within a few weeks of the entry of the Order accompanying this Opinion. This is a strong factor which in our view mitigates the possible irreparable harm Medicorp may suffer, *pendente lite*, by the denial of the preliminary injunction [3].

■ As noted in the chronology of events, the action before us was commenced October 3, 1977. As of the date of this Opinion and Order Humana's proxy material has not even been cleared by the Securities Exchange Commission. Thus, given the steps that must be taken, and the monitoring mechanism which we have adopted as per our Order, until ultimate disposition of the case by us, safeguards are and will be present to prevent irreparable harm to any party. We are not convinced, however, that even in the absence of these safeguards plaintiff has established the degree of irreparable harm, *pendente lite*, which would justify our granting a preliminary injunction; clearly, the presence of these safeguards further bolsters that conclusion.

### B. THE STANDARD REQUIRED TO BE MET TO SHOW ULTIMATE PROBABILITY OF SUCCESS:

■ In *Allis-Chalmers* the Court of Appeals for this Circuit enunciated what would at first blush appear to be a rigid and demanding test of probability of ultimate success *before a preliminary injunction may issue in this type of case.* The Second Circuit, in dealing with issues of harm to third parties and the public interest in complex antitrust litigation, has enunciated a far more flexible standard.[4]

The Third Circuit has indicated it might apply this more flexible approach in an appropriate case.[5] We read *Delaware River*

---

3. In *N. W. Controls, Inc. v. Outboard Marine Corporation*, 317 F.Supp. 698, 703 (D.Del.1970), the court found that a trial date less than three months from the denial of the preliminary injunction militated against a finding of irreparable harm to the moving party.

4. In *Gulf & Western Industries, Inc. v. Great A. & P. Tea Co., Inc.*, 476 F.2d 687, 692–693, (2d Cir. 1973), the Court stated:

'[T]he burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.' (citation omitted)

\* \* \* \* \* \*

[T]he moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litiga-

tion and thus for more deliberate investigation. (citation omitted).

5. In *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 923 (3d Cir. 1974), Judge Rosenn commented, in dicta:

[I]f these remaining factors [the public interest and irreparable harm to third parties] on balance, strongly favored the grant of a preliminary injunction, the trial court's grant of the injunction may not be an abuse of discretion even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required. See *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687, 692–93 (2d Cir. 1973).

In *Copperweld Corporation v. Imetal*, 403 F.Supp., 579, 587 (W.D.Pa.1975), the court con-

*Port Authority* to mean that we must consider all of the relevant factors of public and third party interests, as well as the interests of the litigants actually before us. If, on balance, we find that the net result of irreparable harm strongly favors the plaintiff, then we may grant a preliminary injunction based on a lesser burden of proof than the traditionally required substantial probability of ultimate success on the merits; if, however, the balance does not "strongly favor" plaintiff, then a substantial showing of ultimate success is required. In this case, plaintiff has not demonstrated that the balance tilts so sharply in its favor, that it may invoke the lesser standard; thus plaintiff must show a reasonable probability of ultimate success on the merits in order to obtain a preliminary injunction. We turn next to the second crucial prong of the injunction fork.

## IV. PROBABILITY OF SUCCESS ON THE MERITS:

Plaintiff has alleged a violation of Section 7 of the Clayton Act which forbids corporations to acquire the stock of other corporations:

> where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition . . . . 15 U.S.C. § 18.

Plaintiff contends that the merger of Humana and Medicorp would substantially lessen competition in two different and distinct lines of commerce in the nation as a whole as to one, and in three localities as to the other. Although, as is understandable in a matter of this complexity, there were significant changes in plaintiff's position in defining the relevant lines of commerce during the course of the litigation, the theory which finally evolved follows; each facet will be discussed *seriatim* :

### PLAINTIFF'S THEORY OF THE TWO LINES OF COMMERCE:

1. The *development* of hospitals through activities which cover the fields of: (a)

construction; (b) management; (c) acquisition; and (d) replacement *constitutes a line of commerce which is separate and distinct from the line of commerce in which hospitals provide* medical services to patients and facilities for doctors to perform those services, for the following reasons:

(a) the very dynamic of intensive and successful competition, in and of itself, creates a line of commerce;

(b) the primary business of the proprietary chains is growth through development activities;

(c) the proprietary chains sell development services to community groups and hospitals;

(d) the exchange of development services for support from influential community groups, (the key factor without which a Certificate of Need cannot be obtained), constitutes a revenue generating transaction.

2. The activities of the major proprietary chains form a distinct *sub-market* pursuant to the criteria established in *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); these criteria include:

(a) Recognition within the industry and by the public of the existence of the proprietary chains as a distinct line of commerce, as evidenced by the following indicia of competition;

(1) trade association membership;

(2) identification of the line of competition by competitors;

(3) internal corporate memoranda identifying competition and competitors;

(4) media publications identifying the line of commerce;

(b) A unique cluster of services the proprietary chains provide to their customers.

3. The geographic sweep of the line of commerce defined by development activities is the nation as a whole, and only

cluded that if the Third Circuit were faced with a factual situation similar to *Gulf and Western,*

it would apply the *less* stringent test.

Humana, itself, and proprietary chains which operate on a national basis are competitors in this "section of the country".

4. The merger of plaintiff and defendant will substantially lessen competition in this line of commerce in the nation as a whole by giving the combined firm a market share of 29.5% in an industry in which the top eight firms control 84.2% of the hospital beds.

5. As to the delivery of hospital services, the merger of these two companies will also substantially lessen competition in that line of commerce, in the following three sections of the country:

  (a) Broward County, Florida

  (b) Jefferson County, Kentucky

  (c) Bluefield, West Virginia

### A. Definition of the Services Market:

#### 1. Development of New Hospitals:

Plaintiff seeks to define the relevant services market as the *"development"* of more hospitals to operate through acquisitions, construction, replacement or management, as distinguished from the market for the delivery of short term acute care hospital services to doctors and patients—the operations market. The record establishes that the "development market", at its core, involves the construction of hospitals in locales in which there are no facilities that are conveniently available to doctors or patients before a "developer" enters upon the scene. Plaintiff urges that the mere existence of proprietary chain hospitals is a commercial reality that defines a "development market". It is noteworthy that we cannot find a single case in which "development opportunities" were held to be a line of commerce distinct from the market for the product or service which the company seeks to expand by development, and none was cited to us by plaintiff.

#### (a) The Dynamics of Competition:

Plaintiff directs our attention to "competition" as it exists, and argues that if the evidence establishes that only four or five firms actually compete with each other in seeking new opportunities to provide hospital services where none are now being provided, then these firms must form a relevant line of commerce within the meaning of Section 7. Defendant strenuously objects to this approach, because it inverts the proper order of analysis. We agree.

■ We must begin with the universe of all related transactions between buyers and sellers that constitutes a market; only then can an attempt be made to define competition within the meaning of Section 7. *The basic tests developed by the Supreme Court in defining product and geographic markets only have meaning in the context of transactions between buyer and seller.*[6]

6. The test for a product or services market is cross-elasticity of demand, *United States v. E. I. DuPont deNemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

In *DuPont*, the Court defined a relevant product market in order to determine defendant's power to control price and commodities. To the extent "commodities [are] reasonably interchangeable by consumers for the same purposes", any attempt by DuPont to exercise extraordinary power over the price of cellophane would be met by increased buyer use of "reasonably interchangeable" commodities. 351 U.S. at 395, 76 S.Ct. at 1007. The touchstone of this analysis is the range of choices available to the consumer.

In *Grinnell*, this cross-elasticity of demand analysis, again grounded on consumer choice, was applied to define the market for furnishing security protection services to businesses. The Court held that if a customer could not respond to slight changes in cost by seeking alternative services, then those alleged substitute services were not to be considered as part of the same market.

This principle applies to buyers' markets as well as to sellers' markets, to geographic markets as well as to product markets.

In *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) and in *United States v. Penzoil Co.*, 252 F.Supp. 962 (W.D.Pa.1965), the courts held that the power exercised by buyers to narrow the economic choices of sellers also violated the antitrust laws.

In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the Court defined a geographic market as the arena in which "the seller operates and

(b) *The Importance of Development to a Proprietary Chain:*

Plaintiff contends that proprietary hospital chains are primarily in the business of developing new facilities in order to increase profits. Defendant responds that the development of new business opportunities appears to be a normal internal corporate activity in which no *market* transaction occurs at all. We agree. One division of Medicorp plans and develops a new hospital for another division of that company to operate. *There is neither buyer nor seller, nor even the slightest trace of competition in such a transaction.* This is in sharp contrast to firms geared to providing consultation services which are sold to third party customers. *Neither Humana or Medicorp is interested in a project unless it will ultimately control all phases of operations once the hospital is completed.* Alan Miller, President of Medicorp, testified that, of Medicorp's gross revenues of $450,000,000 for fiscal year 1977, $447,000,000 stemmed exclusively from revenues obtained from operating hospitals. Similarly, Humana's revenues of $371,000,000 came from the same source. No line of commerce can conceivably exist within the meaning of the Clayton Act in this situation. See *Credit Bureau Reports, Inc. v. Retail Credit Co.,* 358 F.Supp. 780 (S.D.Tex.1971), *aff'd,* 476 F.2d 989 (5th Cir. 1973).

A steel company developing a new plant, or an automobile manufacturer licensing a new dealer, engage in development activity which is analogous to that engaged in by plaintiff and defendant; but it must be the end result to which we look in order to define a market for purposes of Section 7—the sale of steel products in the one case and the sale of automobiles in the other. *By the same token, it is the delivery of hospital services to patients and doctors which is the ultimate end product in this hospital business.*

(c) *Sale of Development Services to Community Groups:*

Plaintiff contends that "development activities constitute a sale of services" to the community groups "seeking a new hospital", and that this activity is sufficient to define a "seller's market" for hospital development. However, the record conclusively demonstrates that community groups are motivated by a desire to bring functioning hospitals to their communities, so that services of the type provided by a hospital will be accessible to the doctors in the area and the patients they serve; they have no interest in development services as such. It is not the blueprint they are after, but the finished product—in this case the fully built, equipped and operating hospital.[7]

In attempting to justify its position that the sale of development services created a market, plaintiff advances the proposition that activities need not produce revenue for the antitrust laws to apply to them. In support of this proposition it cites *Mandeville Island Farms, supra, Penzoil, supra* and *Robertson v. National Basketball Association,* 389 F.Supp. 867 (S.D.N.Y.1975) *aff'd on other grounds,* 556 F.2d 682 (2d Cir. 1977).

An analysis of these decisions clearly demonstrates that they do not support

---

to which the purchaser can practicably turn for supplies". 365 U.S. at 327, 81 S.Ct. at 628.

7. Paul Funderburk, President, Brandon Community Hospital, in his letter to Troy Wood, Chairman of the Development of Major Health Care Facility, Tinley Park, Illinois, a witness called by plaintiff, stated that while the community groups needed someone to finance and operate a hospital, they could handle the "political" tasks themselves, and *should* seek their own feasibility study quite apart from one furnished by a proprietary chain.

The testimony of local community "customers" produced by both sides further supports the conclusion that a community group's sole concern is the delivery of *health care services* to residents of the particular locale in which the community group is interested. It is indifferent to the cluster of *development services* allegedly offered by the proprietary chains which are only a means to the end. The bottom line is a functioning entity; while intermediate steps are necessary to achieve this goal, community groups have no more interest in the steps that must be taken than the automobile purchaser does in the internal corporate steps that must be taken to deliver the finished product to her or to him.

plaintiff's attempt to manufacture a market in this case. In *Mandeville*, the buyers were in the business of processing sugar beets, and the sellers were farmers; in *Penzoil*, the buyers were refiners of Pennsylvania grade crude oil and the sellers extracted it. In *Robertson*, the buyers were in the business of purchasing the services of basketball players, and the players in the business of selling their skills.

While it is true that the buyers' activities in these cases did not generate revenue for them, their purchases generated revenue for the seller, who would in fact suffer a loss of income as a direct result of these activities. Thus, in all of the cases cited by plaintiff, the relevant product market was defined by buyer-seller transactions in which the seller received revenues. Accordingly, the courts held that since the alleged wrongful activities arose out of the buyer-seller relationship, the purchasers were not immune from the antitrust laws, regardless of the fact that their wrongful activities did not generate revenues. Nothing in these cases, or indeed in any of the decisional law interpreting the Sherman and Clayton Acts, has been cited by plaintiff, nor discovered by the Court, to support the proposition that the antitrust laws apply to transactions in which neither party has received any revenue.

In contrast to the factual situations presented in the trilogy cited by plaintiff in support of its position, the facts in the case at bar conclusively establish that a community group offers no money to a "seller" of "development services" and it receives no direct economic benefit as a result of the development; the operating revenues belong to the developer. While those who have brought the facility to the community may enjoy the "psychic income" community leaders often deservedly receive for their good work, we do not understand the antitrust laws to include that type of "revenue" within its reach. *The record establishes that in all of the economic transactions which occur in the development of a new hospital the proprietary chain sells its services only to those doctors and patients who will use the completed facility;* the costs of development are paid by the ultimate consumers—the patients.

While a community group receives a real benefit when a proprietary chain constructs a hospital in its locale, it is not an economic benefit that is cognizable under antitrust laws. The relationship between a community group and a proprietary chain is analogous to the relationship between such a group, or its counterpart, and an industry it encourages to locate in that community. Admittedly, there may be economic benefits through the general improvement of the town or city. Nevertheless, a community group which deals with a proprietary chain is not a purchaser of development services, and has not engaged in a market transaction which can be classified as a line of commerce within the Clayton Act.

### (d) *The Exchange of Community Support for Development Services:*

Plaintiff argues that hospital development opportunities differ from those in other businesses because of the impact of government regulation, and that this difference changes the usual economic relationship between the developer and the community. It states that a Certificate of Need represents the grant of a quasi-monopoly, and acquires an economic value as a result of a legally created scarcity. Plaintiff implies that, as a factual matter, the support of the community group is essential in acquiring the Certificate, so that community group support has become a valuable resource that a "developer" must acquire. Proprietary chains bargain for that resource by offering hospital services that meet the community's self-perceived need for those services. The quality of the management, the range of health care services, the number of beds, the degree of community control of operations, the percentage of revenues required to be reinvested, and other factors relating to the delivery of hospital services have an economic value that the community can bargain for in exchange for its support. Plaintiff asserts that the exchange of community support for incre-

ments in hospital services is a sufficient economic nexus to define the development opportunities market in terms of traditional buyer-seller transactions. However, plaintiff has not demonstrated up to this point a reasonable probability of overcoming the legal and factual obstacles necessary to sustain its thesis that there is a "development opportunities" market. Although some testimony indicates that community support is helpful in securing a Certificate of Need, plaintiff has not yet demonstrated whether that connection is necessary, or even typical, in hospital development. While community hostility might be fatal, there is no evidentiary basis for stating what the norm is—community neutrality, for example, rather than active and vigorous support. Plaintiff simply failed to establish its thesis factually.

The legal obstacles are far more imposing. In defining relevant service markets, the Supreme Court in *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), defined the line of commerce in terms of *actual commercial banking services, as delivered, and NOT opportunities to construct new branches.* In *Grinnell*, it held the market *was that which existed for the delivery of protection services, and NOT the opportunities to expand through the construction of new central stations.* The capacity for, and interest in engaging in the "development" of additional facilities necessary to provide a product or service depend on the ability to attract a buyer for that end product—the article or service which that buyer desires to have in finished form. Courts have found existing transactions between buyers and sellers to be the appropriate measure of market power. The capacity to expand, or develop new facilities, has been taken into account within that market analysis by the assessment of changing market shares in the basic product market, considered in the light of overall market conditions.

Every merger not only has an impact on the existing market, but also necessarily eliminates the capacity of the target company to expand. The merger of two supermarket chains, for example, each with a recent history of expansion, both eliminates choices for shoppers *and* for landowners seeking to sell prime locations to the expanding firms. We know of no case that would state that the prospective landowners are persons who have cognizable legal injuries under the antitrust laws.

In the instant case plaintiff claims we must place our primary emphasis on the choices available to the economic equivalent of the landowners—the *"community group"*. Plaintiff argues that the group is a functional seller of a necessary resource—its support in the Certificate of Need process—and concludes that this process must be protected from the loss of competition. No court has extended the antitrust laws to protect such a peripheral interest. It is the ultimate shopper in this case, the doctor and the patient, whose interests are the ones to be protected.

## 2. *Management:*

It is almost impossible to distinguish the fine line that allegedly separates "development through management" from day to day operations of a hospital. Perhaps the economic subtlety of the plaintiff's distinction eludes us, but it does appear that hospital owners enter into management contracts in order to have the managers operate their hospitals. Assuming that "development through management" refers to the competition for management contracts, the activity is still irrelevant. Humana does not compete for management contracts, and plaintiff abandoned any "potential entrant" claim through that door.

## 3. *Acquisition:*

The acquisition of hospitals for the purpose of operating and/or expanding them meets the basic conceptual requirements for a market activity. There is a buyer, a seller, and a commercially significant exchange. Medicorp has presented testimony which establishes its purchases of hospitals over the past ten years, as well as its attempts to purchase facilities which were thwarted by other propriety chains.

This testimony has not been sufficient, however, to establish a real commercial world that is at home within this legal construct. To prove the existence of such a market, plaintiff would have to show the number of hospitals that have been sold in the past five years, the purchasers, the existence of public or industry recognition of this market, or other indicia of a distinct sub-market. See *Brown Shoe*, 370 U.S. at 336, 82 S.Ct. 1502, 8 L.Ed.2d 510. Plaintiff would also have to include changes in ownership which amount to an exchange of value for value, and not limit the market to sales which generate revenue, in order to be consistent with its overall definition of this line of commerce. Even if this factual foundation had been established, the legal basis for this type of market would expand the restrictive effects of Section 7 far beyond the outer limits to which the Supreme Court travelled in *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).[8]

### 4. *Replacement:*

Replacement activities refer to both the substitution of new facilities for outmoded ones, and the expansion of services and/or the number of beds in so doing. This activity can only be performed by the owner of the hospital; it is difficult to imagine what *competition* a hospital would face in replacing itself other than in the context of the regulatory process. The numerous instances cited by Dr. Bradley, a witness called by plaintiff, in which American Medicorp fought with its "competitors" to build new facilities in order to replace existing hospitals, were all cases in which the companies competed to acquire the existing hospital. In this sense "replacement" merely repeats the allegations concerning acquisition.

Competition within the regulatory process refers to the situation in which the hospital that proposes to build an expanded replacement facility is located in a community in which other hospitals also desire to expand in the foreseeable future, so that the total number of beds would be greater than the goal set by the *Health Services Plan*. Even if this latter activity constituted part of a development market, it could only be analyzed within each *Health Services Area* defined by federal law, and the appropriate region defined by state law, if any. As plaintiff has yet to define a relevant geographic market for this activity, or present evidence concerning the commercial realities of existing opportunities within particular sections of the country, there is no factual basis whatsoever for considering this alleged aspect of a development market at this time. Evidence concerning past replacement opportunities was not presented within the context of relevant geographic markets and existing state health planning systems, and thus has little relevance in proving the presently existing market for replacement opportunities. We also have serious doubts as to the legal basis for this contention, even if factually established.[9]

---

**8.** In that case, the Court considered the merger of two supermarket chains which, combined, would control roughly 7.5% of the relevant market—*retail grocery* sales. The Court noted two market trends, the decreasing number of owners operating single stores and the purchase of grocery stores by supermarket chains to be crucial factors in holding that the merger violated Section 7. In nine years, nine of the top 20 chains had acquired 126 stores from their smaller competitors.

The impact of this merger on competition in the "market" for "development opportunities" in the retail grocery business through the acquisition of grocery stores was obviously far greater than that in the market for the sale of groceries. Yet, the court did not refer to any such "development through acquisition" market in *Von's Grocery*, but only to a customer market. The situation here does not differ. "Development by acquisition" is no more than expansion by horizontal merger with potential or actual competitors; the key is the effect on competition for the ultimate consumers.

**9.** Plaintiff has not even raised a substantial question concerning the existence of a product market for replacement activities. In *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the Court first addressed the question of the applicability of the Sherman Act to proprietary hospitals in the precise factual setting of the replacement and expansion of an existing hospital. Mary Elizabeth Hospital, a 49-bed community hospital owned by an out of state proprietary chain, alleged a conspiracy to prevent it from building a 140-bed replacement hospi-

### 5. The Factual Basis:

■ Plaintiff has not at this point established a factual basis for a definition of a genuine development market. Assuming, arguendo, that a distinct national market for development opportunities was created by government restrictions on hospital construction, Plaintiff cannot rely on *past* development opportunities to define that market in the face of testimony that government policy contemplates a 10% *reduction* in the number of hospital beds [10].

■ *Medicorp, to meet its burden of proof, must establish, by the use of some valid sample of Health Service Areas, the current prospects* for development of hospitals in the nation as a whole, or in significant geographic areas.[11] There must be an evidentiary basis from which we can make proper generalizations with respect to a national, or even a meaningful sectional, range of currently existing hospital development *opportunities.* Indeed, even as to *past* developments opportunities, plaintiff has only offered conclusory and fragmentary evidence concerning competition at this point. At a final hearing, plaintiff may be able to meet its evidentiary burden on this score by producing a valid sample of the following:

1. The construction of hospitals from scratch;

2. The significant parties in the "development transactions";

3. The sources of funding for the hospitals;

4. Competition, if any for the development of the hospitals;

5. The role of the Health Systems Agency, or state agency, if any.

### B. Definition of a Sub-Market

Defendant has introduced statistical evidence showing the *de minimis* role the parties have played in the construction of, or investment in, new hospitals in the nation as a whole for the past four years. Plaintiff claims that we should not consider all development, but only those activities that have taken place in a distinct sub-market, which is defined by two factors: (1) industry and public recognition, and (2) the unique "cluster" of services offered by the proprietary chains.

### 1. Industry and Public Recognition

Plaintiff claims that trade association membership, newspaper articles, the recognition of competitors, and each party's own internal corporate documents establish that proprietary chains are a distinct sub-market. We disagree. Membership in the Federation of American Hospitals (FAH) is based on the admittedly arbitrary criterion that a firm owns three or more community hospitals. Whether or not that firm engages in development activities is entirely

tal. Plaintiff claimed that a local proprietary hospital and its co-conspirators attempted to delay, and prevent the issuance of, a state Certificate of Need in furtherance of the conspiracy. The Court considered the "provision of hospital services" to be the relevant line of commerce. 425 U.S. at 739, 741, 96 S.Ct. 1848. Again, as in *Von's Grocery,* the concept of a national development market, in which national chains compete for development opportunities, was not even mentioned by the Court.

We also note that the provision of "replacement" services entirely lacks the structure of an exchange of value for value that plaintiff attributes to the negotiations between a community group and a proprietary chain. As previously noted, expansion would only be undertaken by a hospital *owner*; its only customers would be the doctors and patients it currently serves, or those *it* hopes to serve, in the delivery of hospital services in the local market.

10. For instance, plaintiff's evidence relating to the important role played by proprietary hospitals in the development of beds in Florida for the past ten years has little relevance in defining the contours of the development market for the next five years. Indeed, the testimony adduced demonstrates that the very success of the proprietaries in building new hospitals has effectively eliminated those areas of Florida from the development market.

11. It would greatly assist the court to have before it representatives from both state and federal health planing agencies, and, if it is not the intention of the parties to do so, the Court will invite the Department of Health, Education and Welfare (HEW) to appear as *amicus curiae* at the final hearing.

irrelevant to FAH membership. We find that the FAH guide offers no indication with respect to a listed firm's interest in, or capacity for, building hospitals from scratch.

We also find that the proprietary chains' exclusive competitive concern with other proprietary chains seems to be no more than the natural consequence of their "competition" for investor capital. There is only limited access for direct shareholder investment in the health services field. The evidence establishes investor-owned proprietary chains are competing for a particular share of investor interest in the health services field. Yet no matter how intense competition becomes in the marketplace for the investor dollar, or how many periodicals focus on the "hospital management industry", these activities have no relevance when defining a "line of commerce" within the meaning of Section 7.

### 2. Unique Cluster of Services

Plaintiff's second contention, that the proprietary chains' unique cluster of services distinguishes them from non-profit institutions, is refuted by a line of cases starting with *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

Plaintiff contends the following constitute its unique cluster of development services: (a) design and construction; (b) financing; (c) recruitment of new doctors for the community; (d) organization of doctors in the community; (e) staffing and equipping a hospital; (f) national purchasing of hospital supplies at a discount; (g) feasibility planning; (h) Certificate of Need approval; (i) pre-opening activities; (j) expertise in third party payment problems; and (k) management.[12]

In *PNB* the Court analyzed the cluster of services in terms of market insulation, noting that some services, (such as demand deposits) were absolutely insulated from competition, that some services, (such as personal loans) were effectively protected by cost considerations, and others, (such as savings deposits) benefited from "a settled consumer preference".

In *United States v. Connecticut National Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974) (*CNB*), the Court considered two factors to be crucial in determining that commercial banks and savings bank were in distinct lines of commerce even though both offered checking accounts: commercial banks had 80% of outstanding commercial loans, and savings bank checking accounts, by law could only be offered to individual persons who were non-commercial users.

Of the services enumerated by plaintiff in this case, we find that the record to date establishes that all of these services are available from other sources.[13]

It is true that the proprietary chains have a potential cost advantage over single hospitals in providing many of these services, such as expertise in design, recruitment, equipment and representation in the regulatory process; their size allows them to enjoy the cost advantage of using in-house services, instead of paying outside consultants. However, we must also consider whether the higher costs of obtaining outside consulting services are greater than the revenue saved by not having to distribute

---

12. This "cluster" of services is only relevant in relation to a commercially significant buyer-seller transaction, which as we have held, could only be the exchange of community group support for the delivery of hospital care services. Two conclusions appear to follow. *First*, hospitals, and not alternative providers of development services—such as architects, contractors, consultants, or even turn-key operators—are relevant competitors in the development opportunity market. *Second*, only those "development services" are relevant which plaintiff can demonstrate have a *direct* effect on the delivery of hospital care to *patients*: e. g., offering feasibility studies is clearly *not* relevant, while giving essential financing *not otherwise available*, or only available at a cost differential that would affect patient care, would be.

13. Thomas L. Kempner, Chairman of Loeb, Rhoades & Co., testified that only investor owned hospitals have access to certain capital sources, but other evidence indicates the minimal role that equity financing plays in hospital construction.

profits to shareholders. Assuming that the costs of seeking outside services, in the aggregate, were less than the profits distributed to shareholders, there would be no overall cost advantage of a proprietary chain over a non-profit hospital in competing for development opportunities. Plaintiff has not offered any evidence on this subject; clearly, it has not sustained its burden of proof on this score.

In applying *PNB* and *CNB* to this fact situation, the alleged cost advantage of a cluster of services would only be legally significant if plaintiff could show, as in *CNB*, that it enjoyed an *actual* competitive edge with any particular group of customers as a result of these efficiencies. Plaintiff also as failed to demonstrate that this cluster of services is not provided by centralized, non-profit systems of hospital owners and operators such as the "Lutheran Hospitals and Home Society" or the "Seventh Day Adventists Hospital".

### C. *Geographic Markets*

Plaintiff argues that proprietaries alone engage in the business of acquiring, developing and managing hospitals on a national basis, and contends that only those organizations which also operate on a nationwide basis are its competitors. We disagree. Geographic markets are *inclusive*. As the geographic scope of the market expands, all competitors within the market area must be taken into account.[14]

We find on the record to date that local areas are also a relevant geographic market. There may be more than one relevant section of the country for the purposes of Section 7. See *Brown Shoe, supra,* at 336, 82 S.Ct. 1502; *United States v. Marine Bancorporation,* 418 U.S. 602, 621, 98 S.Ct. 2856, 41 L.Ed.2d 978 (1974). Whatever the potential scope of proprietary chain companies' development activities, construction must occur at a particular site, regulated by a particular state and federal agency, and in competition with any local or regional, profit or non-profit hospital that is capable of, and interested in, constructing new facilities there. At this time it appears that to the extent the development market arises out of the regulated nature of the construction of new hospital facilities, each *Health Service Area* must be considered a relevant section of the country. Thus, the impact of this merger on each *Health Service Area* is clearly relevant.

### D. *Substantial Lessening of Competition*

We agree with plaintiff that the test of illegality under Section 7 of the Clayton Act is market power. However, plaintiff's failure to define adequately either relevant product or geographic markets for a "devel-

---

**14.** In *United States v. Pabst Brewing Company,* 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the Supreme Court held that a merger of two brewing companies, in an industry trending to concentration, violated § 7 of the Clayton Act. The Court also found that there were violations in three relevant markets: in Wisconsin, in a three-state area, and in the nation as a whole. *Id.* at 552, 86 S.Ct. 1665. As the scope of the market increased, the market share of the combined companies obviously decreased: in 1961 the merged companies were first in the Wisconsin market with 27.41% of sales, and third in the nation with 5.83% of sales. The Court had to take into account *all* beer sold nationwide; by plaintiff's analysis, the Court could have eliminated all regional brewers in computing the national market share.

In *Grinnell, supra,* the Court found a national market was appropriate because the firms operated on a national level. Similarly, plaintiff contends, the top four or five proprietary chains operate on a national level, and must also be defined in a national market. However, as the District Court opinion in *Grinnell* makes clear, the national market included *all* providers of central station protection services, whether or not they operated on a national or local level.

The court found that non-defendant firms operated 38 units, of which 28 were operated by firms owning one unit, and the remainder by firms owning two units. In contrast, one defendant operated 121 units in 115 cities in 35 states. 236 F.Supp. 244 at 249–250. The court also found that all defendants controlled approximately 90% of the national market. *Id.* at 254.

The parallel is unmistakable. All competitors in the development market, whether operating on a local, regional, or national scale, must be considered as part of the national market.

opment" market, as discussed in sections IV A and IV C of this Opinion, makes it impossible to determine either market share statistics, or characteristics of the market which would provide "the appropriate setting for judging the probable anti-competitive effect of the merger". *Brown Shoe, supra,* at 332, n. 38, 82 S.Ct. at 1522. We do not have a sufficient evidentiary basis to evaluate the merger's likely effect on competition for development opportunities at this stage of the proceedings. Indeed, it is significant on this score that the record at this stage in the proceedings, establishes that the market for *the delivery of short term, acute care community hospital services to doctors and patients is a relevant line of commerce. In the nation as a whole, the merged company of Humana and Medicorp would control one and seven tenths per cent of the market for the delivery of hospital services (as measured by the number of licensed beds), rather than 29.5 per cent of licensed beds which plaintiff has urged upon us, based on the universe of the 32 proprietary chains which own three or more hospitals, and are listed in the Federation of American Hospitals Directory. The evidence simply does not support this construct.*

Hence, we must hold that at this point plaintiff has failed to show a reasonable probability of success on the merits.

### E. *Local Markets*

█ Plaintiff contends that the proposed take-over will also substantially lessen competition in the line of commerce defined by the delivery of hospital services in at least three distinct local geographic markets. Local markets may be relevant sections of the country within the meaning of Section 7. *Brown Shoe, supra,* at 336, 82 S.Ct. 1502.

Plaintiff alleges that, if the merger is effectuated, Humana will own or operate 16.9 percent of the licensed beds in Broward County, Florida and 27.5 percent of the beds in Jefferson County, Kentucky, and will own or manage 100 percent of the beds in Bluefield, West Virginia. We find that plaintiff has not adequately defined the rel-

evant sections of the country, and that it has not demonstrated that its hospitals in Broward and Jefferson Counties in fact compete for patients or doctors with those owned and operated by Humana.

We also find that plaintiff has demonstrated a reasonable probability of ultimate success in proving that competition in and around Bluefield, West Virginia will suffer as a result of the merger. As long as there is an economic incentive for Medicorp to increase the number of patients using the facility it manages, competition in Bluefield will necessarily be harmed. At the final hearing, plaintiff would have to substantiate this claim by additional proof of the geographic market and the role it plays as manager of the hospital.

### V. *CONCLUSIONS*

█ In light of all of the precedents that have been brought to our attention, or of which we have become aware, we conclude at this stage of the litigation that any claim based on substantial harm to competition in a development opportunities market, or development activities market, does not raise a substantial legal question. We find that the record, at this point, neither provides a factual basis for the definition of a development market as a line of commerce distinct from the provision of hospital services, nor supports plaintiff's proposed market share statistics that the merger of Medicorp and Humana would control 29.5 percent of a line of commerce in which the top four firms control 70.8 percent of that market.

Indeed, based on the record in its entirety, we conclude that the only relevant services market in which this proposed tender offer should be evaluated is the delivery of short term, acute care hospital services to doctors and patients. In this market, we find that community hospitals are in competition irrespective of sponsorship or ownership. The patient's dollar and the doctor's affiliation are avidly fought for by the hospitals in a given community whether owned by the chains, by religious orders, by other non-profit institutions or by local or state

governments. The patient and the doctor are not concerned with ownership but availability of the resources required to serve them.

Humana and Medicorp together control one and seven tenths percent of short term acute care hospital beds in community hospitals in this country in a line of commerce characterized by large numbers of competitors and fragmented ownership.

Although we are not foreclosing plaintiff from presenting such evidence as it deems sufficient to meet its burden at the final hearing, we do hold that on the record before us, plaintiff has failed to demonstrate a reasonable probability of ultimate success at this point in the proceedings.

Nor do we foreclose any attempt by plaintiff at that final hearing to demonstrate that the merger of Medicorp and Humana may substantially lessen competition in the delivery of short term acute care community hospital services in any section of the country.

Indeed, we find that plaintiff has established a reasonable probability of success on the merits in proving that, in Bluefield, West Virginia, competition for the delivery of hospital services may be substantially lessened by this proposed tender offer. However, we also find that the possible harm to the parties and to competition that would result, *pendente lite,* as a result of this potential violation are so minimal that this single, isolated situation could not possibly justify issuing a preliminary injunction on this record. Should the final result require us to so mold a decree, we can consider such action at that time.

Based on our evaluation of the probability of ultimate success, and the balance of harms to the parties, to those not participating in this litigation, and to the public interest, *pendente lite,* we shall enter an accompanying order which will contain the following provisions:

1. Plaintiff's request for a preliminary injunction is hereby DENIED without prejudice to its right to seek a permanent injunction after a final hearing;

2. A final hearing to determine whether or not a permanent injunction shall issue will be held on January 23, 1978, commencing at 11:00 a. m. in Courtroom 10A, United States Courthouse, Philadelphia, or sooner, if the parties are prepared to go forward before that time and to continue until the hearing is completed.

3. A final Order will be entered within three weeks of the termination of that hearing, or sooner, depending on the length of the hearing, additional evidence adduced, and new theories offered, if any.

4. Counsel for defendant shall inform the Court and counsel for plaintiff of each step it intends to take to advance the tender offer at least 48 hours before such step is taken until such time as the final decree is entered;

5. The Court shall retain continuing jurisdiction over this matter until further Order.

## ORDER

AND NOW, this 19th day of December, 1977, upon full consideration of the entire record, including (1) the Notes of Testimony, (2) the exhibits, (3) the proposed findings of fact and conclusions of law submitted by the parties, (4) the voluminous briefs filed with us, and (5) the matters raised at oral argument, it is hereby ORDERED:

1. Plaintiff's request for a preliminary injunction is hereby DENIED without prejudice to its right to seek a permanent injunction after a final hearing;

2. A final hearing to determine whether or not a permanent injunction shall issue will be held on January 23, 1978 (or sooner if the parties are prepared to go forward before that time), commencing at 11:00 a. m. in Courtroom 10A, United States Courthouse, Philadelphia, and to continue until the hearing is completed;

3. A final order will be entered within three weeks of the conclusion of that hearing, (or sooner, depending on the length of the hearing, additional evidence adduced, and new theories offered, if any);

4. Counsel for defendant shall inform the Court and counsel for plaintiff of each step it intends to take to advance the tender offer at least 48 hours before such step is taken until such time as the final decree is entered;

5. The Court shall retain continuing jurisdiction over this matter until further Order.

## APPENDIX A

### I. FINDINGS OF FACT RELATING TO THE STRUCTURE OF THE HOSPITAL INDUSTRY IN THE UNITED STATES

1. Plaintiff, American Medicorp, Inc. ("Medicorp"), is a publicly owned corporation, organized and existing under the laws of the State of Delaware; its corporate headquarters, executive offices and principal place of business are located at 111 Presidential Boulevard, Bala Cynwyd, Pennsylvania.

2. Defendant, Humana, Inc. ("Humana"), is a corporation organized and existing under the laws of the State of Delaware; its principal offices are located at 1800 First National Tower in Louisville, Kentucky.

3. Medicorp owns or leases 39 short term acute care hospitals in 13 states located primarily in the South, Southwest and West, and also manages 12 hospitals not owned by it. (PX–23 at 1). Medicorp's revenues for the 1977 fiscal year ended December 31, 1976 were approximately $450 million. (Tr. at 912).

4. Humana owns and operates 59 hospitals in 17 states, located primarily in the South and Southwest. Humana's revenues for its fiscal year ended August 31, 1976 were approximately $300 million. (Defendant's Answer ¶ 9; SEC Form S–7).

5. In 1976, there were 5,857 non-Federal, general acute-care community hospitals with 956,200 beds in the United States. (Tr. 2079; P–2 at Table 5A, p. 18; D–28; D–28A).

6. In 1976, voluntary not-for-profit entities accounted for 70.1% of the general acute-care community hospital beds in the United States. (Tr. 2079–80; P–2 at Table 5A, p. 18; D–28; D–28A).

7. In 1976, state and local governmental agencies accounted for 21.9% of the general acute-care community hospital beds in the United States. (Tr. 2080; P–2 at Table 5A, p. 18; D–28; D–28A).

8. In 1976, all investor-owned companies accounted for 8% of the general acute-care community hospital beds in the United States. (Tr. 2080; P–2 at Table 5A, p. 18; D–28; D–28A).

9. Combined, Medicorp and Humana accounted for 1.7% of the general acute-care community hospital beds in the United States in 1976. (Tr. 2082–83; P–2 at Table 5A, p. 18; D–28; D–28A).

10. In 1976, excluding state and federally-owned multi-unit hospital systems, there were in excess of three-hundred fifty (350) not-for-profit and for-profit multi-unit community hospital organizations or systems that owned or operated two or more hospitals in the United States. (Tr. 1823–24).

11. The Federation of American Hospitals lists 32 multi-unit investor-owned organizations that own and/or manage three or more general acute-care community hospitals in the United States. (P-1 at pp. 64–95). There are at least nine other multi-unit investor owned organizations that own and/or operate three or more general acute-care community hospitals in the United States. (Tr. 1953–1955, 2095–2107).

12. The proprietary chains currently owning 10 or more hospitals are: American Medicorp; Humana; Hospital Corporation of America; Hospital Affiliates and AID; American Medical International; National Medical Enterprises; Medenco; Charter Medical Corporation.

13. There are over one-hundred and twenty (120) major multi-unit, not-for-profit hospital organizations that own or operate three or more community hospitals in various regions throughout the United States. (D-30).

14. Drawing the line of multi-unit community hospital entities at those who own

or operate three or more hospitals to the exclusion of the large number of entities that own or operate two or more hospitals is arbitrary. (Tr. 335, 2087–88).

15. By 1975, investor-owned hospitals represented only thirteen percent (13%) of all community hospitals and only eight percent (8%) of the community hospital beds. (Tr. 359–60).

16. The community hospital industry is dominated by the not-for-profit institutions, which operate nationally, regionally and locally. (Tr. 1864, 1896–97; P–11 at p. 5).

17. In 1974, federal legislation established local federal *Health Systems Agencies* and parallel state health planning agencies to force public review of all plans for the construction or expansion of hospital facilities that exceed $100,000 in cost by requiring approval by the local governing body through the Certificate of Need process. (Tr. 1017–1019; Tr. 1860).

18. A new hospital, or the expansion of or the addition to existing hospital facilities, cannot be accomplished without obtaining the approval of the local governing body through the Certificate of Need process. (Tr. 1019).

19. The Department of Health Education and Welfare is currently proposing that the number of hospital beds be cut-back by ten percent (10%) because of perceived overbedding in the United States. (Tr. 1503–04).

## II. FINDINGS OF FACT RELATED TO THE DEFINITION OF THE RELEVANT LINES OF COMMERCE

A. *The Dynamics of Competition for Construction of Hospitals from Scratch*

20. In Brandon, Florida, Humana submitted two proposals to a group of local citizens which was promoting the development of a new hospital. (Tr. 398–400; P–16 and P–17). Medicorp also submitted a proposal and won the competition. (Tr. 401).

21. A community group in Loveland, Colorado considered a number of alternatives for replacing its old hospital with a new facility including Safecare Co. (a subsidiary of Safeco, Spokane, Washington, an insurance company), National Health Services, Inc., Lutheran Hospitals and Home Society, a non-profit multi-unit organization, and Humana, an investor-owned company. The Lutheran Hospitals and Home Society established the hospital for Loveland, Colorado. (Tr. 2019–22; D–23 at p. 78).

22. A community group in Clovis, New Mexico considered a number of alternatives for replacing its old hospital with a new facility including: (1) having the local doctors establish the replacement facility; (2) having the city or county establish the facility; (3) having non-profit religious organizations, including a Catholic group, a Baptist organization, a Methodist organization and the Presbyterians establish the facility; and (4) having investor-owned hospital companies, including Medenco, Hospital Corporation of America, Humana and Hospital Affiliates establish the facility. The Presbyterian Hospital Center of Albuquerque established the hospital in Clovis, New Mexico. (Tr. 1241–45).

23. In most counties in the United States, where hospitals already exist and where shifts in population might occur, there is a great likelihood for the local hospitals, or hospital systems, to build satellite hospital facilities to meet the needs of the shifting population. (Tr. 1855–58).

24. A number of factors work in favor of non-profit institutions being given the opportunity to develop satellite hospitals to meet the demand of shifting populations, not the least of which are political and religious considerations. (Tr. 1857–59).

B. *The Importance of Development*

25. The major proprietary chains are committed to growth in revenues, capacity and earnings. (Tr. 193–194, 305–306, 778).

26. The non-profit multi-unit hospital systems must generate a surplus or profit in order to meet community needs. (Tr. 1841–42).

27. Medicorp and Humana perform planning, designing, engineering, constructing, equipping and staffing services only for hospitals that they own or operate or that they intend to own or operate. (Tr. 907–910, 1484–1485).

28. The construction of hospitals from scratch, by Medicorp and Humana, and the provision of additional development services in order to accomplish the opening of an operational hospital, are, in essence, intracorporate transactions between internal divisions of the company.

#### C. *The Sale of Development Services*

29. Medicorp does not receive any revenue directly from the development of hospitals. (Tr. 496, 616–617, 915).

30. Of the $450,000,000 in revenues, approximately $447,000,000 will be earned as a result of Medicorp's operation of the 40 hospitals that it owns. (Tr. 914).

31. Approximately $3,000,000 will be earned as a result of management fees paid to Medicorp for managing hospitals owned by others. (Tr. 912).

32. The community groups do not receive the revenues of hospitals developed "for" them. (Tr. 417).

33. The "sale" of "development services" to community groups neither generates revenue for the seller, nor results in a direct economic benefit for the buyer.

#### D. *The Exchange of Community Support for Development Services*

34. Both Humana and Medicorp bargained for the support of the community group in Brandon, Florida, in an attempt to develop a new hospital from scratch. (Tr. 399–403).

35. Medicorp has not produced any evidence to demonstrate that the support of a local community group is a necessary, or even typical, occurrence when an organization seeks to obtain a Certificate of Need.

#### E. *Management*

36. The management of hospitals is precisely the delivery of short term, acute-care hospital services to doctors and patients.

37. Humana does not engage in the management of hospitals for others. (Tr. 1473–1475).

38. Plaintiff has abandoned the claim in ¶¶ 19–21 of the Amended Complaint that this merger would eliminate potential competition between Medicorp and Humana in the hospital management submarket. (Tr. 84–85, 212).

#### F. *Acquisition of Hospitals*

39. Proprietary chains compete for the acquisition of hospitals. (Tr. 395–396, 425–429, 468–470, 667, 680–683, 972, 980–983).

40. Medicorp has only provided isolated and fragmentary evidence concerning the market for the acquisition of hospitals. Without any market statistics, or any other evidence concerning the systematic nature of transactions for the acquisition of hospitals, it is impossible to determine whether or not the acquisition of hospitals constitutes a line of commerce.

#### G. *Replacement*

41. The alleged competition for replacement is most often the competition for acquisition of a hospital owned by another. (Tr. 428–429, 667, 981–983, 985).

42. The only genuine competition for replacement, as such, is among all hospitals interested in, and capable of, expanding their facilities, where the projected expansion of all hospitals in a community exceeds the level of need determined in the area's *Health System Plan.*

43. Competition for replacement and expansion can only occur on a local level.

44. Plaintiff has introduced no evidence whatsoever concerning competition for replacement and expansion between facilities it *owns* and those owned by any other organization.

### III. *FINDINGS OF FACT RELATED TO THE DEFINITION OF SUBMARKETS*

#### A. *Industry and Public Recognition*

45. There are limited opportunities for investment in the multi-billion dollar health care field. (Tr. 1628–1631).

46. The voluntary non-profit institutions and the proprietary investor-owned companies produce a profit in the sense of current operating revenues exceeding costs. (Tr. 371–72).

47. For example, Intermountain Health Care, Inc., is a non-profit multi-unit hospital entity, with a central organizational structure, that owns or leases fourteen (14) hospitals in three (3) states, which in its recent fiscal year generated a surplus of 8.2% or $10,000,000 out of revenues totaling $121,000,000. (Tr. 2008–2009).

48. Proprietary chains are a new means for individual investors to enter this field. (PX–79).

49. The Hospital Management Industry and its members referred to in speeches, 10–K Forms, media articles, and internal competitive reports, are those organizations which compete in the stock market for a share of the public investor interest in the health care industry. (PX–20, 28, 53, 59, 78, 79, 80, 81).

50. Federation of American Hospital (FAH) membership has no relevance to a member's interest in, or capacity for, developing new hospitals in addition to any it may currently operate.

51. FAH membership has no probative value in the determination of the relevant line of commerce in this case.

52. An organization's form of ownership, whether proprietary or non-profit, is a characteristic that has no relevance in the determination of a relevant line of commerce in this case.

B. *Cluster of Services*

53. Non-profit hospital institutions and systems have various sources of financing for the construction of hospital facilities: (1) tax-free revenue bonds; (2) Hill-Burton Act credits or subsidies, and similar programs; (3) normal mortgage financing; (4) various charitable contributions; and, (5) accumulated revenues from the operation of the hospitals.

54. Non-profit hospital institutions have a significant advantage in obtaining financing in comparison to for-profit institutions with respect to tax-free revenue bonds, which provide one hundred percent financing and have single A and double A ratings. (Tr. 1123, 1148–49).

55. Equity financing for investor-owned hospital companies has been rarely used in the last four years for hospital financing. (Tr. 2157–58).

56. In 1975, funds for community hospital investment were raised as follows: (1) debt financing: 66.9% of total with tax-exempt revenue bond issues making up 54.6% of that percentage; (2) non-debt financing: 33.1% of total with private non-profit sources—philanthrophy, grants, reserves— accounting for 24.5% of that percentage, government grants accounting for 24.5% of that percentage, and non-debt financing by investor-owned sources representing only 5.1% of that percentage; and, (3) only 1.5% of all hospital investment financing was done through equity financing. (Tr. 2156–58; D–34).

57. Non-profit hospital institutions negotiate national contracts for the purchasing of supplies and equipment used in their hospital facilities. (Tr. 1845–46).

58. Non-profit hospital institutions also participate in shared service organizations which offer purchasing services on a national contract basis. (Tr. 1845–46).

59. Voluntary Hospitals of America is a cooperative buying entity made up of thirty (30) non-profit hospital institutions which represents shared purchasing for supplies and equipment of over $1 billion. (Tr. 1845–46).

60. Medicorp has failed to demonstrate that any other of its development services, whether or not directly related to the delivery of hospital services, are insulated from effective competition, either by law, by cost, or by quality.

61. Medicorp has failed to establish the existence of a development opportunities market as a line of commerce distinct from the basic business in which community hospitals engage; the delivery of short term acute-care community hospital services to doctors and patients.

611

62. Even if there were a development market, it would include all hospitals and hospital organizations who are interested in, and capable of, the construction or expansion of fully operational facilities.

## IV. FINDINGS OF FACT RELATED TO THE ASSESSMENT OF THE IMPACT OF THE MERGER ON COMPETITION

63. In the market for the delivery of hospital services, the merged firm will control 1.7% of community hospital beds.

64. Market share statistics based on the total number of beds owned and operated by proprietary chains who are listed in the FAH directory have no relevance to competition as it exists in any line of commerce in any section of the country.

65. Medicorp has not rebutted the following statistics offered by Humana concerning development activities:

a. New investment in community hospitals for plant and equipment increased from $3.5 billion in 1973 to $4.9 billion in 1976; the combined share of Humana and Medicorp in new investment declined from $80,-100,000 (2.3%) in 1973 to $49,300,000 (1.0%) in 1976. (D–32A).

b. Private hospital construction for the years 1973 to 1976 remained relatively stable at approximately $2.3 billion per year; the combined total of Humana and Medicorp in private hospital construction for these years declined from $80,100,000 (3.5%) in 1973 to $49,300,000 (1.9%) in 1976. (D–33A).

## V. FINDINGS OF FACT RELATED TO LOCAL MARKETS

66. Neither Florida nor Texas constitute commercially or economically meaningful areas in which to assess the construction, expansion, replacement or renovation of hospital facilities because such activity depends upon a large number of local as opposed to state-wide considerations including political, religious and social factors, hospitals already located in a particular area, and local governing bodies that review need factors.

67. Humana's only hospital located within Broward County, Bennet Community Hospital (located in Fort Lauderdale, Florida), competes with only four other hospitals—Plantation, Florida Medical, Pembroke Pines and University—none of which are owned or operated by American Medicorp. (D–14 at pp. 8, 11–14).

68. The only hospitals situated in the area served by Doctor's Hospital of Hollywood, Inc., one of Medicorp's hospitals located in Broward County, are Community Hospital of South Broward, Memorial Hospital, Hollywood Medical Center, and Pembroke Hospital, none of which are owned or operated by Humana.

69. Humana owns St. Joseph's Infirmary, a hospital which is located some 15 miles from Southwest Jefferson Community Hospital, the only Medicorp hospital in Jefferson County, Kentucky. St. Joseph's is outside the primary service area of Southwest Jefferson Community Hospital. Similarly, Humana's other hospital in Jefferson County, Suburban, is located more than 22 miles away from Southwest Jefferson Community Hospital and is not within the service area of the Southwest Jefferson Community Hospital. (D–17, Exhibit 3 at numbered pp. 3–4).

70. Medicorp's Southwest Jefferson Community Hospital was and is intended to serve the needs of the southwest portion of Jefferson County, Kentucky. The closest acute-care community hospital to Southwest Jefferson Community Hospital is Sts. Mary and Elizabeth Hospital, some 11 miles away. No other hospital in all Jefferson County is situated, with respect to travel time, to adequately serve the needs of the residents of southwestern Jefferson County. (D–27, Exhibit 1 at pp. 3–4, Exhibit 2 at p. 5, Exhibit 3 at numbered pp. 3–4, 9).

71. Even the originally proposed site for Southwest Jefferson Community Hospital, which was 11 miles and 22 minutes from Humana's St. Joseph's Infirmary, was viewed by Medicorp as "quite remote" from and "not convenient to" St. Joseph's Infirmary. (D–27, Exhibit 2 at p. 8).

72. Numerous acute-care community hospitals are situated closer to St. Joseph's Infirmary than is Southwest Community Hospital. These include St. Anthony's Hospital and Kentucky Baptist Hospital (each located only one or one and one-half miles from St. Joseph's), Methodist Hospital (located only two or two and one-quarter miles from St. Joseph's), Jewish Hospital, Louisville General Hospital, and Louisville Memorial Hospital. (D–27, at pp. 66–69, and Exhibit 3 at p. 18-map).

73. Bluefield, West Virginia, is presently served by only two hospitals: Bluefield Community Hospital operated under a management-development contract by Medicorp, and St. Luke's Hospital, acquired by Humana in 1969. The Humana and Medicorp facilities are the only two hospitals available to the doctors and residents of Bluefield. (Tr. at 665).

74. The hospital located in the nearby town of Princeton is a "secondary competitor." (P–63 at 2).

## APPENDIX B

## CONCLUSIONS OF LAW

1. The relevant product market is the operation and management of short term acute-care community hospitals.

2. The development of new hospital facilities through the construction, acquisition, management or replacement of hospitals is not a significant factor in defining a line of commerce distinct from the delivery of hospital services.

3. FAH membership has no relevance in determining the relevant line of commerce.

4. The court finds that speeches, intra-corporate competition reports, newspaper articles, and the testimony of non-party proprietary chain executives concerning competition in the "hospital management industry" refer to the competition for investment capital in the stock market, and have no relevance in determining the relevant line of commerce.

5. The cluster of services offered by proprietary chains to communities without readily available hospital services is not sufficiently insulated from competition by local, regional and national non-profit systems, and local proprietary hospitals, to define a distinct line of commerce.

6. All hospitals, or multi-unit hospital organizations, with the capacity for and interest in engaging in the construction or expansion of new hospitals are competitors for the development of hospitals.

7. To the extent that the nation as a whole is a relevant geographic market, all hospitals competing for the opportunity to construct new hospitals must be included whether they operate on a local, regional, or national level. Whether or not the nation as a whole is a relevant section of the country, the Court finds that each *Health Service Area* is a relevant geographic market in which plaintiff must demonstrate the likely impact of the merger on competition for present and future development *opportunities.*

8. Because of plaintiff's failure to define adequately either the relevant product or geographic markets, the Court cannot make any assessment at this time concerning the probability of its success on the merits in demonstrating that competition may be substantially lessened in any line of commerce or in any section of the country. Market shares based on the proportion of beds owned by proprietary chains in the universe of firms listed in the FAH guide are clearly irrelevant in making this determination.

9. Plaintiff has not demonstrated a reasonable probability of success on the merits in proving that this merger may substantially lessen competition in the provision of hospital services in Broward County, Florida, or Louisville, Kentucky.

10. Plaintiff has demonstrated a reasonable probability of success on the merits in proving that the merger would lessen competition in Bluefield, West Virginia, but has not demonstrated the requisite irreparable harm arising from this single instance of harm to competition.

11. The Court finds that Medicorp will suffer minimal irreparable harm if no preliminary injunction issues, and that such injuries will be alleviated by the scheduling and monitoring provisions of the Order which accompanies this Opinion.